Steven A. Christensen (USB 5190)
Cameron S. Christensen(USB 16015)
Christensen Young & Associates, PLLC
9980 South 300 West #200
Sandy, UT 84070
Telephone: (801) 676-6447
Facsimile: (888) 569-2786
steven@christensenyounglaw.com
cameron@christensenyounglaw.com
Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **NELLIE H. CHRISTENSEN**, **MARC FUTTERMAN, GREGORY R. WILSON**, on behalf of themselves and all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>**ELISABETH DEVOS**, in her official capacity as Secretary of Education, the **UNITED STATES DEPARTMENT OF EDUCATION, NAVIENT CORPORATION, NAVIENT SOLUTIONS, LLC, NAVIENT, CORPORATION, NELNET SERVICING, LLC, PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY (PHEAA) dba FEDLOAN SERVICING, AND UTAH HIGHER EDUCATION ASSISTANCE AUTHORITY (UHEAA),**<br><br>Defendants. | **[PROPOSED CLASS ACTION] AMENDED COMPLAINT**<br><br>Case No. :19-cv-00509<br><br><br>Judge Dustin B. Pead |

**COME NOW**, Plaintiffs Nellie H. Christensen, Marc Futterman and Gregory R. Wilson, individually and on behalf of all others similarly situated nationwide, by and through their attorneys, Christensen Young & Associates, PLLC, and hereby files this Amended Class Action Complaint against Elisabeth DeVos, in her official capacity as Secretary of Education (hereinafter "DeVos"), the United States Department of Education, Navient Corporation, Navient Solutions, LLC, Nelnet Servicing, LLC ("Nelnet"), Pennsylvania Higher Education Assistance Agency (PHEAA) doing business as FedLoan Servicing ( herein after jointly referred to as "FedLoan"), and Utah Higher Education Assistance Authority ("UHEAA") and asserts the following claims under the Administrative Procedure Act ("APA"), the Due Process Clause of the Fifth Amendment to the United States Constitution, and civil procedure laws and statutes and assert and allege as follows:

## **INTRODUCTION**

1.     Since 1983 the cost of obtaining a higher education has risen over seven hundred percent.[1] Yet over 40 million students have taken out more than 1.4 trillion dollars in student loans,[2] with approximately ninety percent of those loans being compromised or funded by the

---

[1] *See* Jack Remondi, *Five Recommendations For Better Student Loans* 2, NAVIENT (July 2018), https://news.navient.com/static-files/4a05a5f2-bfb1-4cff-a4de-2e471ba01af1 .
[2] *See id.* at 1; U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation* 122 (July 2018), https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf; Jessica Silver-Greenberg & Stacey Cowley, *In Navient Lawsuits, Unsettling Echoes of Past Lending Crisis*, N.Y.TIMES (Jan. 19, 2017), https://www.nytimes.com/2017/01/19/business/dealbook/navient-loans-lawsuit.html; AFT Higher Education, On the Backs of Students and Families: Disinvestment in Higher Education and the Student Loan Debt Crisis 1,14, https://www.aft.org/sites/default/files/studentdebt0613.pdf .

Federal Government.[3]

2.     The escalating cost of obtaining a higher education degree has had a directly proportional impact on numerous public service sectors, including, but not limited to, teachers, governmental employees, police officers, nurses, *et al*.  These professions require the higher education degrees, or enhanced degrees to meet and maintain job requirements, and *ergo*, mandate acquiring diploma's in their selected fields.

3.     As early as 2007, Congress recognized a growing shortage of teachers and public servants as a direct result of the cost associated with obtaining a degree in public service to obtain a degree and repay the horrendous loans associated with college.[4]

4.     "In recent months, educators and other school personnel have walked out to demand a living wage in exchange for the jobs they love. Teachers are working in fast food restaurants or selling plasma to pay their bills."[5] "[I]n no state does a teacher's assistant making the average salary earn enough to provide for the basics for him- or herself and one child."[6] "In 38 states, the average teacher salary in 2018 is lower than it was in 2009 in real terms.… According to the Economic Policy Institute, teacher pay fell by $30 per week from 1996 to 2015, while pay for other college graduates increased by $124."[7] Teachers and other public

---

[3] Randi Weingarten, *Public Service Debt Relief Is Broken*, N.Y. TIMES (Sept. 27, 2018), https://www.nytimes.com/2018/09/27/opinion/public-service-loans-education.html .

[4] . The education workers' in the United States began a national wave of strikes in 2018, referred to as Red for Ed, with recent strikes in West Virginia, Oklahoma, Arizona, North Carolina, Colorado, adjunct professors at Virginia Commonwealth and Los Angeles Unified School District, among others for increased pay and benefits for the teachers.

[5] Randi Weingarten, *Public Service Debt Relief Is Broken*, N.Y. TIMES (Sept. 27, 2018), https://www.nytimes.com/2018/09/27/opinion/public-service-loans-education.html

[6] AFT, A Decade of Neglect: Public Education Funding in the Aftermath of the Great Recession 4, https://www.aft.org/sites/default/files/decade-of-neglect-2018.pdf .

[7] *Id.* at 5.

servants who are unable to pay back their student loans on these dramatically inadequate wages often face seizure of their professional licenses and loss of their livelihood, with ruinous effects on their families, neighborhoods, and communities.[8]

5.     On September 27, 2007, Congress acknowledging the necessity of allowing more individuals into public service sector positions enacted the College Cost Reduction and Access Act, Pub. L. 110-84.

6.     To encourage students to enter public service sectors Title IV of the College Cost Reduction Act, was codified in 20 U.S.C. § 1087e(m), and established the Public Service Loan Forgiveness ("PSLF") program, a federal entitlement guaranteed by Congress which mandates that the Department of Education "shall cancel the balance of interest and principal due" for qualifying loans held by public servants after 120 payments.  Public servants' entitlement to the relief promised by Congress is enshrined in this federal law.[9]

7.     The Federal Government, as the guarantor or lender of the vast majority of the crushing student debt load, through the United States Department of Education (the "Department of Education"), enters into a standardized Master Promissory Note Contract ("MPN Contract") with each borrower of a federal student loan, which explains the terms and conditions of the loan.  This MPN Contract details a borrower's rights under the loans, including the availability of the PSLF program.   A report publicly issued by the Government Accountability Office ("GAO") in September 2018, stated that the "[Department of] Education

---

[8] Jessica Silver-Greenberg, Stacy Cowley, and Natalie Kitroeff, *When Unpaid Student Loan Bills Mean You Can No Longer Work*, N.Y. TIMES (Nov. 18, 2017), https://www.nytimes.com/2017/11/18/business/student-loans-licenses.html
[9] College Cost Reduction and Access Act, Pub. L. No. 110-84, § 401, 121 Stat. 784, 800 (2007) (codified at 20 U.S.C. § 1087e(m)).

is responsible for establishing the administrative structure necessary to fulfill the PSLF program's goal of encouraging individuals to enter and continue in public service employment by providing loan forgiveness to eligible borrowers who meet program requirements."[10]

8.      The purpose of PSLF was, and is, to relieve the burden of student debt for those individuals willing to engage in public service, including, but not limited to; teachers, nurses, police officers, firefighters, government employees, non-profit employees, and a litany of others who had made 120 qualifying payments on eligible student loans on a qualifying repayment plan, while working at a qualifying job.

9.      Millions of public servants have relied on PSLF in taking out student loans, making career choices, and deciding whether to refinance student loans. The PSLF program is life-or-death critical to America's public servants who otherwise would never be able to overcome their student debt burden. Student loan debt is materially different from most forms of debt as it *generally cannot be discharged in bankruptcy* unless the borrower can establish that repaying the loan would cause "undue hardship," a standard that is nearly impossible to meet unless the borrower has a severe disability. Consequently, for many public servants, PSLF is their only means of escaping their student debt.[11]

10.      Qualification for PSLF is intended to be straightforward—a borrower must: (i) have loans issued directly from the Federal Government; (ii) be employed full-time, as defined by the program, by a qualifying public service employer; and (iii) make 120 on-time payments

---

[10] U.S. GAO, *Public Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers* 24 (Sept. 2018), https://www.gao.gov/assets/700/694304.pdf .

[11] *See* 11 U.S.C. § 523(a)(8); *see also* Kayla Webley, *Why Can't You Discharge Student Loans in Bankruptcy?*, Time (Feb. 9, 2012), http://business.time.com/2012/02/09/whycant-you-discharge-student-loans-in-bankruptcy/ .

under a qualifying repayment plan. A borrower may confirm eligibility for PSLF and track qualifying payments by regularly submitting "Employment Certification Forms" to the Department of Education.

11.     The qualifying repayment plans available to borrowers are supposed to work in concert with PSLF.  Specifically, borrowers are entitled to repay their debt on income-driven repayment plans, which tie monthly payments to the borrower's wages and family size and can result in payments as low as $0 a month.  Thus, a public servant is supposed to be able to make manageable monthly payments toward the student loan for ten years, and after ten years, the remaining student debt is forgiven.

12.     Tragically, it does not work that way in practice, in large part because the proper administration of the PSLF program depends on private, for-profit "servicing companies," with which the Department of Education has contracted to administer and manage federal student loan repayments. The PSLF program depends on the performance of these private servicing companies and their truthful communication with our nation's most deserving borrowers when they are at their most vulnerable.

13.     In spite of the alarming failure of the Department of Education to resolve failures of overseeing the proper administration of the PSLF Program, they are letting down the very individuals it was designated to help.

14.     The Department of Education has failed to uphold Congress's promise to the people by denying PSLF loan forgiveness to applicants on arbitrary and capricious grounds, without any meaningful process to review erroneous decisions, or to ensure that Title IV loan

servicers[12] provide accurate guidance to borrowers regarding their eligibility for loan forgiveness.

15.    According to its own reports, the Department of Education had forgiven the loans of *fewer than 1%* of the borrowers applying for PSLF as of March 2019.[13]

16.    The Department of Education denied a staggering 71% of the 73,554 unique PSLF applications received since October 2017 for purportedly failing to meet eligibility requirements, such as having the correct type of loan or repayment plan or employment in a qualifying job.

17.    Only 518 public servants have received PSLF thus far—a negligible number compared with the estimated 32 million borrowers who, according to the Consumer Financial Protection Bureau ("CFPB"), were making payments on potentially eligible loans at the end of 2016.[14]

---

[12] "Title IV loan servicers" service loans issued under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §§ 1070 *et seq.* They include servicers known as TIVAS (Title IV Additional Servicing) Servicers: (i) Navient Corporation ("Navient") (formerly known as SLM Corporation/Sallie Mae); (ii) Nelnet Servicing, LLC ("Nelnet") (Nelnet acquired Great Lakes Educational Loan Services); and (iii) Pennsylvania Higher Education Assistance Agency a/k/a FedLoan Servicing ("FedLoan Servicing"), as well as various not-for-profit servicers. *See* U.S. Dep't of Educ., Fed. Student Aid, *Loan Servicing Contracts*, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing (last visited July 16, 2019). Title IV loan servicers have a direct contractual relationship either with the Department, when servicing loans held by the Department, or with non-Departmental commercial lenders and loan holders as part of the Federal Family Education Loan ("FFEL") Program. The Department maintains oversight authority over all Title IV servicers, regardless of whether it directly contracts with them, as explained *infra*.

[13] U.S. Dep't of Educ., Fed. Student Aid, *March 2019 PSLF Report* (Mar. 31, 2019), https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (hereinafter "FSA, *March 2019 PSLF Report*") (last visited July 16, 2019).

[14] *Id.*; *see also* Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back: The Cost Of Student Loan Servicing Breakdowns For People Serving Their Communities* 20 n.34 (June 2017) (hereinafter "CFPB, *Staying on Track*"), https://files.consumer-

18.    Public servants like Nellie Christensen (high school teacher), Marc Futterman (IRS and FBI agent) and Gregory R. Wilson (Peace Corps worker and non-profit universities), have borne the brunt of the Department of Education and servicing companies (Navient, UHEAA,'s and other named servicers) failures: each of the Plaintiffs made the requisite 120 + qualifying payments, which were miscounted, and when Plaintiffs attempted to point out the errors they were ignored, their files closed and were denied loan forgiveness.

19.    Defendant Navient, for example, not only was the primary loan servicer for all named Plaintiffs, but is additionally a massive servicing company for federal student loans. Navient is responsible for servicing over $205.9 billion in federal student loans, owed by approximately 6.1 million accounts.[15]

20.    Navient, along with other named defendant servicing companies, has entered into lucrative Servicing Contracts (as defined herein) with the Department of Education to administer borrowers' loans and to communicate with borrowers on behalf of the Department of Education about their loans.  Under the Servicing Contracts the loan servicing defendants are charged with providing borrowers with the best repayment options for each borrower's specific financial circumstances.

21.    Navient is required to give borrowers accurate information about the repayment and forgiveness options available under federal law, including PSLF.  When borrowers face financial distress and cannot make their payments, they contact Navient, or other servicers to discuss alternative payment options, and Navient along with other named servicing defendants, has held itself out as a source of reliable information and assistance for borrowers to gain their

---

finance.gov/f/documents/201706_cfpb_PSLF-midyear-report.pdf  .
[15] *See* Navient Corp., 2017 Annual Report (Form 10-K) 9 (released Feb. 26, 2018).

trust in a time of financial crisis.

22.   For example, in its 2017 Annual Report (Form 10-K) filed with the United States Securities and Exchange Commission ("SEC"), Navient stated, "We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment …, through more than 162 million communications annually, including mail, email, phone calls, videos and text messages."[16]

23.   In blog posts that remain available, Navient's leadership has promised to help those borrowers in their most difficult times:

• "All borrowers, and especially those facing financial strain, should be encouraged to engage directly with their servicers—not driven away from them by misleading and false rhetoric. Together, we can ensure that even those who are anxious about their loans know they have options. Help is a phone call away."[17]

• Navient's "priority is to help each of our 12 million customers successfully manage their loans in a way that works for their individual circumstances."[18]

24.   Loan servicer defendants have not been living up to their obligation to help vulnerable borrowers get on the best possible repayment plan and qualify for PSLF. Instead, loan servicing defendants have harmed and continue to harm millions of hard-working public

---

[16] *Id.*
[17] Jack Remondi, *It's Time To Put Students First*, MEDIUM (May 23, 2016), https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e .
[18] Jack Remondi, *It's Time To Put Students First*, MEDIUM (May 23, 2016), https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e .

servants by routinely providing false information to these borrowers, preventing them from qualifying for the PSLF program and loan forgiveness. This misinformation has caused millions of eligible student loan borrowers to pay hundreds of millions of dollars in loans which should have been forgiven under the PSLF and Temporary Expanded Public Service Loan Forgiveness Program ("TEPSLF").

25.    In 2018, recognizing the inadequacies of the existing PSLF Program, Congress enacted an extension to PSLF, the Temporary Expanded Public Service Loan Forgiveness Program ("TEPSLF"), in an effort to provide a *temporary* band-aid for some of PSLF's widely recognized failures. TEPSLF narrowly expands the qualifications for PSLF by allowing borrowers who made 120 payments in certain otherwise non-qualifying payment plans to receive loan forgiveness on a first-come, first-served basis until TEPSLF funds run out. Like PSLF, TEPSLF mandates that the Department of Education forgive loans for those that qualify. But the Department of Education has failed to properly oversee loan servicers and, as with PSLF, mismanaged TEPSLF as well: as of March 2019, only 3.6% of TEPSLF applications have been approved.[19]

26.    Public servants like Plaintiff Nellie H. Christensen, Marc Futterman and Gregory R. Wilson are casualties of the Department of Education's failure to administer its program, and provide proper oversight to the loan servicers, as dictated by congressional mandate.

27.    In order to engage in public service as a schoolteacher, Mrs. Christensen obtained a degree in English and a Master's Degree of Education from the University of Utah. She was required to take out student loans which were placed with Defendant Navient.

---

[19] FSA, *March 2019 PSLF Report*, *supra* note 2.

28.     Mrs. Christensen made the requisite 120 qualifying payments starting in 2004 and in October and November of 2014 Mrs. Christensen requested the promised loan forgiveness.

29.     The Department of Education denied her requests giving her a generic response that contended she was not eligible for loan forgiveness due to "inconsistent payments" and "loan types," but refused to provide her with a precise reason for refusal to forgive her student loans under PSLF.

30.     Despite qualifying for the loan forgiveness over four years ago, Mrs. Christensen is still paying on her loans after being declined loan forgiveness relief by the Department of Education.

31.     Plaintiff Marc Futterman began working with the Internal Revenue Service in 2005, in 2008 he changed jobs from IRS to the Federal Bureau of Investigations and has continuously worked for the government since 2005 to the present date.

32.     Mr. Futterman was eligible for loan forgiveness as soon as 2015.

33.     Mr. Futterman's student loans were transferred between servicing agencies who convinced him that the only way of pursuing loan forgiveness was to consolidate his loans, which he did in August of 2018.

34.     Plaintiff Marc Futterman, after serving in government public service for over fourteen years, was intentionally given inaccurate and misleading information in order for the servicing agency, and the Department of Education to make money from Plaintiff.  Plaintiff Futtermans' student loans have not been forgiven.

35.     Plaintiff Gregory R. Wilson obtained student loans for this education, and did not

get sufficient or correct counseling in obtaining the student loans. Defendant Navient intentionally mislead and gave incorrect information to Plaintiff Wilson.

36. Plaintiff Wilson was working for the Peace Corps as a government employee and notified Navient counselors that he specifically wanted to be in compliance with anything necessary to qualify for PSLF benefits.

37. Plaintiff Wilson was informed that he was on track and needed to continue his employment in non-profit, governmental or other qualifying employment, which Plaintiff complied with. However, Navient counselors, being fully aware that Plaintiff was relying on their expertise, failed to inform Plaintiff Wilson that his employment had to be pre-certified.

38. Navient, as other defendant student loan servicers, has held itself out as available to give expert guidance if borrowers have any questions or concerns about the types of repayment plans or forgiveness options available. Specifically, Navient on its website proffers that:

● "Student borrowers who reach out to their servicer when they have questions tend to be more successful in repayment. Navient is here to help."[20]

●"We keep in touch with you throughout your repayment period and are here to answer any questions along the way.… We're here to answer your questions, provide you with solutions, and process your payments."[21]

39. Plaintiff Wilson was not informed of the employment certification requirements until July 2017, at which time he contacted all prior employers and submitted the certifications

---

[20] Navient Solutions, LLC, *5 Habits Of Successful Student Loan Borrowers*, https://www.navient.com/loan-customers/getting-started/successful-student-loanborrowers /
[21] Navient Solutions, LLC, *New To Navient*, https://www.navient.com/new-to-navient

of employment for the prior 5 years to Navient.

40.     In July 2017 Plaintiff Wilson was informed that he had to change to FedLoan Servicing to "enter" the PSLF program.   He was further informed that it would take approximately 60 days for FedLoan Servicing to determine the number of qualifying payments Wilson had made in the prior five year.

41.     Navient and FedLoan failed to inform Wilson of the number of qualifying payments within the 60 day period, and, in fact, it took over a year of monthly calls to FedLoan from Wilson to learn that he had been enrolled in the "wrong repayment plan" and that all of his previous payments would not count toward PSLF relief.

42.     Solely in the pursuit of increasing its own profits, and at the direct expense of our nation's public servants, Navient has:

• Deceived borrowers by informing them PSLF was not available to them or that Navient does not offer PSLF, without specifying that the Department of Education offers PSLF and another servicer, FedLoan Servicing, administers it;

• Misrepresented to borrowers they were "on track" for PSLF when in fact their loans would not qualify for PSLF without consolidation;

• Misled borrowers by stating they were "on track" for PSLF when in fact their repayment plan did not qualify for PSLF; and

• Advised borrowers not to submit paperwork that would verify their employment and other qualifying factors for PSLF, which would have resulted in their loans being transferred to FedLoan Servicing.

43.     As a direct result of Navient's, and other defendant loan servicer's misconduct,

and failure to disclose material facts, borrowers have been denied loan forgiveness at alarming rates, with horrifying effects on the borrowers and their families and communities.

44.    The Department of Education has disregarded repeated misrepresentations that the Title IV servicers have made to borrowers about what loans and loan repayment plans qualify for PSLF.

45.    The Title IV defendant servicers repeatedly informed Plaintiffs that they were "on track" for PSLF and making "qualifying" payments for PSLF, even though loan servicer defendants did not actually know, or it they did know intentionally withheld vital information that would allow qualifying payments and loan forgiveness to Plaintiffs and "millions" of other student loan borrowers.

46.    None of the Plaintiffs became aware that their payments "did not count" until years after years of misrepresentation, failure to disclose material facts, or other misleading, inaccurate or outright wrong information from defendant Title IV servicers.

47.    Had defendant loan servicers given Plaintiffs the correct information, they easily could have consolidated their loans, entered qualifying repayment plans, and been eligible for forgiveness under PSLF.   Instead of acknowledging the defendant Title IV servicers' misrepresentations and using its loan discharge authority to redress these errors, the Department of Education has turned a blind eye to this misconduct, even though this abhorrent, repugnant conduct it is well-documented.[22]

48.    A September 2018 Report by the Government Accountability Office ("GAO")

_____

[22] *See, e.g.*, Alexandra Hegji, Cong. Research Serv., No. R45389, *The Public Service Loan Forgiveness Program: Selected Issues* 23–25 (Oct. 29, 2018), https://fas.org/sgp/crs/misc/R45389.pdf .

confirms that the Department of Education has identified widespread defendant servicers misconduct, however it has failed to take steps to give the defendant servicers adequate guidance or instructions on how to administer the PSLF Program or ensure that defendant servicers receive consistent loan payment history information from other loan servicers when borrower accounts are transferred. Nor does the Department of Education require the servicers to give borrowers accurate information on which payments qualify for PSLF—information that is critical given the long period of repayment required before any borrower can be eligible for loan forgiveness.[23]

49.     The Department of Education's Office of Inspector General ("OIG") issued its own report in early 2019, echoing the GAO's conclusions about misconduct by the Department of Education and Title IV servicers.[24]

50.     In an audit of the Federal Student Aid ("FSA") office—a division of the Department of Education—OIG found that "[f]rom January 1, 2015 through September 30, 2017, 61 percent. . . of [the] reports on FSA's oversight activities identified instances of servicer noncompliance with Federal loan servicing requirements."[25]   As a result of these violations, defendant servicers placed borrowers in non-qualifying repayment plans, or incorrectly calculated the number of monthly payments borrowers owe on their federal loans.

---

[23] U.S. Gov't Accountability Office, GAO-18-547, *Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers* 24 (Sept. 2018) (hereinafter "GAO, *Public Service Loan Forgiveness Report*"), https://www.gao.gov/assets/700/694304.pdf.

[24] U.S. Dep't of Educ., Office of Inspector Gen., ED-OIG/A05Q0008, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans* (Mar. 5, 2019), https://www2.ed.gov/about/offices/list/oig/auditreports/fy2019/a05q0008.pdf  (hereinafter "OIG, *Federal Student Aid*").

[25] *Id.* at 4.

51.     The OIG also found that while the Department of Education is fully aware of these problems, it is doing nothing to remedy them. According to the OIG, the Department of Education rarely, if ever, penalizes servicers for noncompliance, fails to track noncompliance, and refuses to prioritize the interests of borrowers over the interests of servicers.[26]

52.     The Department of Education's mismanagement of PSLF has harmed millions of Americans and disemboweled the PSLF program by processing a miniscule 206 borrowers applications from the 32 million borrowers who were potentially eligible for PSLF at the end of 2016.[27]

53.     Plaintiff represents the experiences of millions of public servants harmed and injured by the Department of Education's negligence, and incompetence.

54.     Responsibility for the egregious mishandling of PSLF lies squarely at the feet of the Department of Education, which "is responsible for establishing the administrative structure necessary to fulfill the PSLF Program's goal of encouraging individuals to enter and continue in public service employment by providing loan forgiveness to borrowers who meet program requirements."[28]

---

[26] *Id*. at 2, 9-10, 17

[27] *Fed. Student Aid, PSLF Report, https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (last updated Sept. 30, 2018);* see *Gregory Korte,* More Than 41,000 Public Service Workers Sought Federal Student Loan Forgiveness. The Government Approved Just 206*, USA TODAY (Dec. 27, 2018),* https://www.usatoday.com/story/news/nation/2018/12/27/student-loan-debt-department-education-public-service-loan-forgiveness-denial/2366589002/.

[28] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 24; *see also* H. Rep. No. 110-210, at 48-49 (2007) ("The Committee believes that through increased Pell Grants, programs for better debt management and loan forgiveness, students are better able to assemble a package of debt relief to ensure a brighter future with less financial burdens. Debt burdens are particularly troublesome for public servants who often earn low salaries for their work. The policies embodied in H.R. 2669 recognize the contributions and challenges of public service, and the

55.     At her confirmation hearing, Secretary DeVos assured members of the Senate and the American public that under her leadership, the Department would make good on PSLF's promise to America's public servants.

56.     Secretary DeVos promised that, "if confirmed, [she] look[ed] forward to working with Congress on ways to ensure that borrowers of Federal student loans continue to have manageable repayment options that are simple and easy to understand."[29]

57.     Secretary DeVos told Senator Orrin Hatch that "the issue of student debt and the amount of student debt . . . is a very serious issue and one which we all have to pay very close attention to and resolve in some way," and further promised that, "[i]f confirmed, I certainly will look forward to working with you and your colleagues on ways to get after this issue."[30]

58.     Secretary DeVos assured members of the Senate and the public that she would pursue "successful implementation of the law" and "facilitate compliance with the laws that the Department is charged to enforce."[31]

59.     When asked about her commitment to PSLF, Secretary DeVos testified that, "if confirmed, [she would] faithfully implement the Higher Education Act"[32] and "ensure [the Department of Education] is appropriately answering any technical assistance request we receive from entities or individuals interested in learning more about the Public Service Loan

---

Committee hopes to encourage participation in these careers.").

[29] *Nomination of Betsy DeVos to Serve as Secretary of Education: Hearing of the Comm. on Health, Education, Labor, and Pensions*, 115th Cong. 120 (Jan. 17, 2017) (hereinafter "*DeVos Nomination Hearing*"), https://www.govinfo.gov/content/con- tent/pkg/CHRG-15shrg23667/pdf/CHRG-115shrg23667.pdf .

[30] *Id*. at 24.

[31] *Id*. at 98.

[32] *Id*. at 120.  As explained below, the Higher Education Act of 1965 was amended by the College Cost Reduction and Access Act of 2007, which created PSLF.

Forgiveness program."[33]

60.     Secretary DeVos lived up to none of those promises.   Ignoring Congress's mandate, Secretary DeVos and the Department she leads have done nothing to remedy the gross mismanagement of the PSLF (including TEPSLF) Program, despite documented knowledge of these failures.   Indeed, Secretary DeVos has publicly rejected PSLF's very purpose, stating, "[w]e don't think one type of job, one type of role, should be incentivized over another."[34] Secretary DeVos "propose[d] eliminating Public Service Loan Forgiveness" going forward,[35] and the Trump Administration proposed that appropriations for the PSLF Program be eliminated entirely in the 2020 budget.[36]

61.     According to a report issued by AFT: "The challenges posed are not only economic—with billions of dollars going toward servicing debt instead of being used to purchase homes, start families or simply have a night on the town—but are moral as well. The promise of higher education, which has historically been a vehicle for social mobility and, in these times, is considered necessary for a decent job, is becoming out of reach for those facing economic hardship and, increasingly, for members of the middle class.[37]

62.     Defendant loan servicers are in an extremely lucrative business relationship with the Department of Education, and in order to increase their profits even more defendant loan servicers structures its employees' compensation to incentivize short calls by rewarding employees for rushing borrowers off the phone, thereby preventing borrowers from receiving

---

[33] *Id*. at 177.
[34] *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the House Comm. on Educ. and Labor*, 116th Cong. (Apr. 10, 2019) at 04:01:57 (testimony of Betsy DeVos, Secretary of Education), https://www.c-span.org/video/?459644-1/education-policy-hearing-secretary-devos (last visited July 16, 2019).
[35] *Id.*
[36] Annie Nova, *Education Dept. faces 10% funding cut under Trump's 2020 budget proposal*, CNBC (Mar. 11, 2019), https://www.cnbc.com/2019/03/11/trumps-budget- proposal-would-cancel-public-service-loan-forgiveness.html  (last visited July 16, 2019).
[37] AFT Higher Education, *supra,* at footnote *6*.

full and accurate information about their best repayment options. Navient, for example, pays its customer service and pre-default collections employees based on average call time with borrowers—the shorter, the better. ***Navient targets less than 7 minutes per call with borrowers***—a woefully inadequate amount of time for a servicer to assess a borrower's financial situation, analyze and present the best options, and advise on how to proceed to meet program requirements and the borrower's financial goals.

63.     Because defendant loan servicers pay their employees to avoid engaging in lengthy conversations with a borrower, they instead advocate for quick and easy options that are not in the borrower's best interests. According to Lynn Sabulski, who worked for Navient's Wilkes-Barre, Pennsylvania call center for five months in 2012: "Performing well meant keeping calls to seven minutes or under…. If you only have seven minutes, the easiest options to put a borrower in, first and foremost, is a [F]orbearance."[38]

64.     A Forbearance can be devastating for a borrower as it potentially ***increases*** the total loan amount the borrower has to pay.  A borrower who enters loan Forbearance is temporarily relieved from making loan payments, but the interest continues to accrue, and the borrower may end up owing more money at the end of the Forbearance period than before. At the same time, a borrower on Forbearance has been unable to make any progress in qualifying for PSLF as he/she is not making any qualifying payments.

65.     Because of the devastating effects of Forbearance on a borrower's financial life, Forbearance is not supposed to be used when borrowers can afford to pay some amount each month. Instead, borrowers in such situations should be offered income-driven repayment plans, which tie manageable monthly payments to the borrower's wages and family size and which qualify for PSLF.

66.     Yet, even though the defendant loan servicers know or should have known of the

---

[38] Daniel Rivero, *Debt Trap: How The Student Loan Industry Fails Young Americans*, FUSION (Sept. 7, 2017), https://fusion.tv/story/580018/debt-trap-how-the-student-loan-industry-fails-young-americans/ .

deleterious effects of Forbearance on borrowers, call center workers still routinely pushed borrowers into Forbearance rather than income-driven repayment plans, and some even hung up on borrowers who sought help filling out income-driven repayment forms.[39]

67.     Defendant loan servicers' misconduct has caused public service employees to spend millions, if not billions, of dollars on student loan payments that could have been reduced or eliminated through PSLF. When these borrowers try to apply for PSLF, they learn that their prior payments did not qualify for PSLF, as the defendant loan servicers claimed they would. And the borrowers then have to make additional payments to qualify or default on their loans. This misconduct by the defendant loan servicers has thus forced thousands of hardworking public servants into a lifetime of debt servitude.

68.     Secretary DeVos, the Department, and the Trump Administration cannot disregard the Constitution and federal law by blocking the overwhelming majority of public servants from obtaining the benefits to which they are entitled under PSLF and TEPSLF.  They must implement PSLF and TEPSLF in a manner that provides public servants a meaningful chance to secure the benefits made available by Congress.

69.     The Due Process Clause of the Fifth Amendment requires the Department of Education to provide processes that give PSLF and TEPSLF applicants notice and a meaningful opportunity to be heard on issues affecting their eligibility for this statutorily granted entitlement.

70.     The APA requires the Department of Education to engage in reasoned decision-making, to consider all essential facts, and to provide an adequate explanation for its decisions to deny public servants benefits under PSLF and TEPSLF.

71.     The Department of Education's administrative process is practically nonexistent. The Department of Education consistently makes administrative mistakes on such routine matters as counting the number of qualifying payments, and the Title IV servicers misrepresent PSLF's

---

[39] Molly Hensley-Clancy, *How America's Student Loan Giant Dropped The Ball*, BUZZFEED NEWS (Feb. 13, 2017), https://www.buzzfeednews.com/article/mollyhensleyclancy/how-things-went-wrong-at-americas-student-loan-giant .

eligibility requirements when borrowers ask how they can obtain loan forgiveness. The Department of Education then fails to consider evidence of these pervasive errors or misrepresentations in making eligibility determinations and, to make matters worse, its denials provide no meaningful explanation of the reasons for rejection.

72.     Borrowers who should qualify for PSLF or TEPSLF, including Plaintiffs and class members, have not received forgiveness for reasons completely outside their control.  The Department of Education has eviscerated the statutory promise of loan forgiveness for those who have spent a decade or more in public service dutifully repaying their loans.  Plaintiffs bring this action to require the Department of Education to fulfill its mandate to lawfully administer the PSLF Program, including TEPSLF.

73.     As Senator Hillary Clinton remarked on the Senate floor the day that the final bill creating PSLF was approved:

> I hear from many young people in New York and around the country, who want to be teachers, police officers, nurses, social workers and public defenders, but sadly are so straddled with debt, such careers are not an option for them.  This is the wrong policy; and today, we send the message that we want to encourage more young people to go into lower paying public service jobs.… I strongly believe this program will help to fill the void in public service our nation will soon face as our baby boomer generation sets to retire by providing an incentive for college graduates to pursue lower paying, but vital professions.[40]

74.     And as Senator Patrick Leahy stated:

> Because tuition has increased well beyond the rate of student assistance, students today are graduating with staggering debt burdens. With the weight of this debt on their backs, recent college graduates understandably gravitate toward higher paying jobs that allow them to pay back their loans. Unfortunately, all too often these jobs are not in the arena of public service or areas that serve the vital public interests of our communities and of our country. We need to be doing more to support graduates who want to enter public service, be it as a child care provider, a doctor or nurse in the public health field, or a police officer or other type of first responder.[41]

---

[40] 9/7/2007 Sen. Hillary Clinton Congressional Record S11249.
[41] 7/19/2007 Sen. Patrick Leahy Congressional Record S9574-02.

75.    Instead of helping relieve the financial burden of student loans by supporting PSLF, defendant loan servicers have added another level obstructing and blocking these public servants from obtaining relief and locking these public servants in a prison of permanent financial distress.

76.    Borrowers who have placed their trust in the United States Department of Education, Navient Corporation, Navient Solutions, LLC, Nelnet Servicing, FedLoan Servicing, and UHEAA, and other federal loan servicers find themselves in worse, not better, circumstances. This action seeks to compensate borrowers who qualify for PSLF based on their employment for the harm caused by Defendants joint and several misconduct and to stop Defendants from continuing to lead borrowers into financial ruin simply to increase their own profits.

77.    By misleading borrowers about the PSLF program, Defendants  (a). breach the Servicing Contracts between the loan servicers and the Department of Education for which Plaintiffs and those similarly situated are intended third-party beneficiaries; (b). breaches an implied warranty made to Plaintiffs and those similarly situated; (c). tortiously interferes with the MPN Contracts; d. tortuously interferes with expectancy of loan forgiveness after 120 PSLF-qualifying payments; e. unjustly enriches Defendants at the expense of Plaintiffs and those similarly situated; f. violates their fiduciary duty owed to Plaintiffs and those similarly situated; g. violates the standard of care that defendants loan servicers owe Plaintiffs and those similarly situated; h. makes negligent misrepresentations in violation of Texas, Maryland, Utah and all 50 states laws; h. violates the Maryland Consumer Protection Act, Md. Code Ann. Com. Law § 13-301 *et seq*.; i. violates the Utah Consumer Sales Practices Act, Utah Code § 13-11-1 *et seq.*, j.

Texas Deceptive trade Practices-Consumer Protection Act, Texas Business and Commerce Code, §17.41 *et seq.* and each separate states' consumer protections statutes.

78.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the proposed Nationwide Classes and Subclasses of borrowers in Maryland, Utah, and Texas, of all individuals who: (i) have or had federal FFEL or Direct Loans serviced by loan servicer defendants, (ii) have been employed full-time, under the definition used by the program, by a qualifying public service employer for purposes of PSLF; (iii) have contacted one of the defendant loan servicers regarding their eligibility for PSLF; and, for the injunctive relief classes, (iv) intend to contact one of the defendant loan servicers in the future regarding their eligibility for PSLF. Loan servicing defendants and Elisabeth Devos, in her official capacity, and the United States Department of Education caused Plaintiffs, along with those similarly situated, significant damage including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Defendant's misconduct, misrepresentations, failure to administer the PSLF program, failure to oversee the servicing defendants.

79.     Defendants, jointly and severally, place Plaintiffs, along with those similarly situated, in imminent danger of future irreparable harm by continuing its pattern of failing to properly administer the PSLF program, misconduct, misrepresentations, providing false information to borrowers, *etc.* Plaintiffs therefore seek to enjoin the Elisabeth Devos in her official capacity as the Secretary of Education, the United States Department of Education, Navient Corporation, Navient Solutions, LLC, Nelnet Servicing, FedLoan Servicing and

UHEAA from continuing to misrepresent to borrowers that they are not eligible for PSLF; from providing incorrect information to borrowers regarding PSLF; from affirmatively restricting borrowers' ability to enroll in PSLF; from misconduct and monetary gain at the expense of eligible student loan borrowers; to require loan service defendants to change their incentive compensation programs so that their employees are not paid based on how quickly they can end a conversation with a borrower; from Elisabeth Devos, and the United States Department of Education from failing to properly oversee and regulate the PSLF program as enacted by Congress.

## PLAINTIFFS

80.     Plaintiff Nellie H. Christensen is a resident of Utah who was a public servant as a high school teacher in the Granite School District for over ten years. Her education was only achievable through loans, which she was informed if she made 120 payments, as a public servant, the remaining balance would be forgiven.  Plaintiff made the required qualifying payments and was nevertheless denied loan relief under PSLF.

81.     Plaintiff was informed by defendant UHEAA that if she worked 5 years at a title one school her student loans would be forgiven, which information Plaintiff relied on to her detriment.

82.     After five years of employment Plaintiff inquired when her loans would be forgiven and was informed that the defendant UHEAA agent who had spoken to her previously was wrong and that her student loans would not be eligible for forgiveness until she had made ten years of payments.

83.     Plaintiff, again relying on the alleged expertise of UHEAA agents, continued to make monthly payments for 120 months.  At the end of that period she again contacted UHEAA and was informed she had to contact the United States Department of Education for

relief.

84.     Plaintiff Christensen contacted Defendant United Stated Department of Education in October of 2014 requesting loan forgiveness.  Defendant United States Department of Education denied Plaintiffs' request and instructed her to continue making payments.

85.     Plaintiff made repeated demands to Defendant UHEAA to provide her with loan relief.  UHEAA gave Plaintiff Christensen repeated false and misleading information, which included, *inter alia,* that her loans should have been forgiven after 5 years at the title one school where she taught for ten (10) years; that her loans qualified for forgiveness after ten years; that she was ineligible for any relief due to the type of loan she was initially instructed to take out, even though she expressly informed the lender and servicer that she was going to school to become a teacher.

86.      The American Federation of Teachers ("AFT") is a membership organization representing 1.7 million pre-K-through-12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals.

87.     A survey of AFT's members showed that eight out of every ten respondents who struggle financially consider student loan debt a "major burden or challenge."[42]   Many AFT members report being unable to afford basic household needs, including food, rent, and other necessities, because of the burden of their student loans.[43]   Some members even reported suicidal tendencies related to the crushing weight of student loan debt.

88.     Plaintiff Marc Futterman is a resident of Texas, and is currently a government employee working with the Federal Bureau of Investigation.  In 2005 when Marc took out his

---

[42] Hart Research Association, *Effects of Debt on AFT Members Who Struggle Financially* 3 (June 2018),  https://www.aft.org/sites/default/files/ppt_aft-member- debt_hart2018.pdf.
[43] *Id*. at 3, 14.

student loans he was intentionally misled into taking out a FFEL loan, even though he expressed he wanted to apply for the PSLF program. This misleading material representations were made by loan servicers including, Citibank, Sallie Mae and Navient.

89.     In 2018 Marc contacted his loan servicer to see why his loan had not been forgiven and for the first time was informed that the FFEL loan he was originally given, was not eligible for the PSLF program and he needed to consolidate his loans because he needed to have a "Direct Loan" to be eligible for the PSLF program loan forgiveness.

90.     Marc contacted his loan servicer to determine what action was best. His loan servicers, Sallie Mae, now known as defendant Navient, indicated they would get back to him within 60 days to let him know the number of qualifying payments he had made. Thereafter, for the next 10 months, Marc called bi-weekly or monthly to see why they had not given him the information they promised to have to him within 60 days.

91.     Marc was informed he needed to consolidate his loans and then the eligibility of the number of qualifying loan payments could be determined.

92.     Marc received incorrect and misleading information regarding eligibility for PSLF loan forgiveness, and relied on the false information in making timely payments (many months making 2-3 payments), yet he did not have his loan forgiven when he was eligible and has continued to make monthly loan payments on a loan that should have been forgiven over four years ago.

93.     Gregory R. Wilson is a resident of Maryland, who was initially working with the Peace Corps and made it crystal clear that he intended to work for non-profit entities, and wanted to have his loan compliant with PSLF requirements. Defendant Navient expressed to Plaintiff that it had expertise as a student loan servicer, and would assist him with any questions, including assisting him with enrolling in repayment plans and loan forgiveness programs.

94.     Gregory frequently requested information about the status of his loan payments and Defendant Navient assured him he was on track to have his loans forgiven. Navient never told Gregory that he had failed to secure job certifications from his employers and it was not

until 2017 when his loan was transferred to FedLoan Servicing that he became aware of the false and misleading statements of Navient.

95.     The Title IV servicers, Navient Corporation, Navient Solutions, LLC, Nelnet Servicing, FedLoan Servicing, UHEAA, and the United States Department of Education mislead the student borrowers, misrepresented material facts regarding eligibility requirements for PSLF loans, and/or omitted providing critical, material information to Plaintiff's and class members regarding federal loans programs and PSLF.

## DEFENDANTS

96.     Defendant Elisabeth DeVos, in her capacity as Secretary of the Department of Education, is responsible for administering the federal student loan program, including PSLF and TEPSLF.  Secretary DeVos is "authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department."[44]

97.     Secretary DeVos maintains an office at the Department's headquarters, located at 400 Maryland Avenue S.W., Washington, D.C. 20202.

98.     Defendant United States Department of Education is a federal agency headquartered in the District of Columbia.  Its principal office is located at 400 Maryland Avenue S.W., Washington, D.C. 20202.

99.     Defendant Navient, Corporation is the successor to the Student Loan Marketing Association (commonly referred to as "Sallie Mae"), a government sponsored student enterprise created by Congress in 1972 to support the guaranteed student loan program created by the Health and Education Act.

100.    Sallie Mae became fully privatized by 2004. Sallie Mae then split into SLM Corporation, which served as the parent company, and Sallie Mae, Inc., which served as the subsidiary responsible for a majority of the company's servicing and collections businesses.

---

[44] 20 U.S.C. § 1221e-3.

101. In April 2014, SLM Corporation separated into two publicly-traded entities: (i) Defendant Navient Corporation ("Navient Corp."), a servicing and debt collection business, and (ii) SLM Corporation, a student lending business.

102. This split enabled Navient Corp. to continue servicing loans while SLM Corporation was able to provide private loans at interest rates and fee structures lower than other lenders. According to Forbes magazine: "The bottom line is that Sallie Mae is changing, and it's going to leverage its brand recognition among college students to provide other services that will likely be more profitable for them."[45]

103. Jack Remondi, former president and CEO of Sallie Mae and current CEO of Navient Corp. and Navient Solutions as defined below, described the transition to Navient as follows: "Helping our customers navigate the path to financial success is everything we stand for.… Our new name—Navient—symbolizes the expertise, experience, and dedication we consistently deliver for our clients and customers."[46]

104. Pursuant to the 2014 split between Navient Corp. and SLM Corporation, Navient Corp. assumed responsibility for liabilities resulting from the pre-reorganization conduct of the prior SLM Corporation and its subsidiaries related to servicing student loans. Navient Corp. is included in this Complaint as a successor to SLM Corporation, for servicing misconduct occurring prior to 2014, as well as a stand-alone entity for the similar misconduct it engaged in after the 2014 split.

105. Navient Corp. is a Delaware corporation with its principal place of business located at 123 Justison Street, Wilmington, Delaware 19801 with call centers in Fishers, Indianapolis, and Muncie, Indiana; Newark, Delaware; Newton, Massachusetts; Reston,

---

[45] Robert Farrington, *How The Sallie Mae And Navient Split May Help Student Loan Borrowers*, FORBES (May 20, 2014), https://www.forbes.com/sites/robertfarrington/2014/05/20/how-the-sallie-mae-navient-split-may-help-student-loan-borrowers/#522d1a3c19af .

[46] Sallie Mae, *Sallie Mae Selects Navient As Name For New Loan Management, Servicing, And Asset Recovery Company* (Feb. 25, 2014), https://news.salliemae.com/press-release/corporate-and-financial/sallie-mae-selects-navient-namenew-loan-management-servicing .

Virginia; Washington, D.C.; and Wilkes-Barre, Pennsylvania.[47]

106.    Navient Corp. is a publicly-traded corporation trading under the symbol NAVI. Navient Corp. is the parent company of Defendant Navient Solutions, LLC ("Navient Solutions") f/k/a Navient Solutions, Inc. ("NSI").

107.    As of December 31, 2016, Navient Corp. held a portfolio $87.7 billion dollars worth of FFEL Loans.  Navient Corp. pools individual FFEL Loans held in its portfolio into securitized trusts known as student loan asset-backed securities ("SLABS"), which are then sold to investors.  The net interest income earned by SLABS backed by FFEL Loans is Navient Corp.'s greatest source of revenue.[48]

108.    The 2014 split also resulted in the transfer of Sallie Mae, Inc. to Navient Corp. Sallie Mae, Inc. then changed its name to Navient Solutions, Inc.

109.    NSI is a Delaware corporation and wholly-owned subsidiary of Navient Corp. NSI is the main servicing subsidiary of Navient Corp., servicing over $300 billion in student loans for more than 12 million borrowers. Of those 12 million borrowers, approximately 6.1 million have federal student loans. Federal student loans make up $205.7 billion of Navient's total servicing portfolio.[49]

110.    Following a corporate reorganization, NSI changed its name, effective January 31, 2017 to Navient Solutions, LLC ("Navient Solutions," and together with Navient Corp., "Navient" or "Defendants").

111.    Defendant Navient Solutions is a Delaware limited liability company and wholly-owned subsidiary of Navient Corp.

112.    Since their founding, there has been significant overlap between the corporate governance and management of Defendants.

113.    Defendants have acted and continue to act as a single enterprise, including by

---

[47] See id.
[48] See Navient Corp., 2017 Annual Report, supra note 13, at 8, 40.
[49] Id. at 4, 9

having identical equitable ownership and identical directors and officers. For example:

a. Jack Remondi simultaneously serves as President and Chief Executive Officer of both Navient Corp. and Navient Solutions;

b. John Kane simultaneously serves as Chief Operating Officer for both Navient Corp. and Navient Solutions;

c. Christian Lown simultaneously serves as Executive Vice President and Chief Financial Officer for both Navient Corp. and Navient Solutions;

d. Steve Hauber simultaneously serves as Senior Vice President and Chief Risk and Compliance Officer for both Navient Corp. and Navient Solutions; and

e. Stephen O'Connell simultaneously serves as Senior Vice President and Treasurer for both Navient Corp. and Navient Solutions.[50]

114. Navient Corp. issues consolidated annual reports and SEC filings for itself and all subsidiaries outlined above.

115. Navient Corp. owns or leases the offices used by Navient Solutions.

116. Navient Corp. controls and directs the hiring of employees for its subsidiaries.

117. Navient Corp. and Navient Solutions use the same website.

118. Navient Corp.'s website provides links to investor information, which includes quarterly investor presentations issued by Navient Corp. but are copyrighted by Navient Solutions.

119. Navient's Code of Business Conduct states that it "applies equally to all of us – employees, officers and directors of all Navient companies, including Navient Solutions, LLC … and all other direct and indirect subsidiaries of Navient Corporation (referred to collectively as 'Navient'), as well as consultants hired by Navient."[51]

---

[50] Navient, *Leadership*, https://about.navient.com/values-and-people; Stephen O'Connell, LinkedIn, https://www.linkedin.com/in/stephen-o-connell-b632b512
[51] Navient, *Navient Code of Business Conduct* 5 (Aug. 2017), https://www.navient.com/assets/about/investors/corp-governance/business-code/NavientCodeOfBusinessConduct.pdf.

120. Nelnet, Inc. is a public company headquartered in Lincoln, Nebraska and incorporated in Nebraska in 1977.

121. Nelnet purchased UNIPAC Service Corporation, an existing loan servicing company in 2000. UNIPAC Service Corporation was renamed Nelnet Loan Services, Inc.

122. Nelnet owns over 50 subsidiaries that administer and collect student loans throughout the United States and Canada.

121 Nelnet Servicing, LLC noted in its December 31, 2018 SEC 10-k filing that it was servicing $464.6 billion in government-owned, FFEL loans, private education and consumer loans.

122. Defendant Pennsylvania Higher Education Assistance Agency (PHEAA) doing business as FedLoan Servicing is a quasi-governmental agency, headquartered in Harrisburg, Pennsylvania.

123. PHEAA conducts its student loan servicing activities nationally as FedLoan Servicing and contracts with the Federal Government to service federal loans.

124. In 2018 Massachusetts sued Defendant Pennsylvania Higher Education Assistance Agency (PHEAA) doing business as FedLoan Servicing for wrongfully failing to count periods of forbearance for borrowers to satisfy the requirements of certain loan forgiveness programs and unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

125. Utah Higher Education Assistance Authority ("UHEAA") is a Utah state government agency and part of the Utah System of Higher Education and acts under authority delegated by the Utah State Board of Regents.

126. UHEAA is governed by an eleven member Board of Directors and Utah's Commissioner of Higher Education and was formed in 1977.

127. UHEAA contracts with the Federal Government to service federal loans.

128. At all relevant times, each Defendant acted individually and jointly with every other named Defendant in committing all acts alleged in this Amended Class Action Complaint.

129. At all relevant times, each Defendant acted: (a) as a principal; (b) under express or implied agency; or (c) with actual or ostensible authority to perform the acts alleged in this Amended Class Action Complaint on behalf of every other named Defendant.

130. At all relevant times, each Defendant acted as the agent of the others, and each Defendant acted within the scope of its agency as an agent of another.

131. At all relevant times, each Defendant knew or realized, or should have known or realized, that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Amended Class Action Complaint. Knowing or realizing that the other Defendants were engaging in such unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

## JURISDICTION

132. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1332 because it is a case arising under federal law.

133. The relief requested herein is authorized by the Administrative Procedure Act, 5 U.S.C. § 702, and the Court's authority to enjoin federal officers from violating the U.S. Constitution and federal law.

134. Congress has waived sovereign immunity as to the relief requested pursuant to 5 U.S.C. § 702, and sovereign immunity does not bar Plaintiffs from securing relief for the Fifth Amendment Due Process Clause violations and other claims alleged herein.

135. Defendants' actions complained of herein with respect to each Individual Plaintiff constitute final agency actions,[52] and no further exhaustion of remedies is required by

---

[52] *See* 34 C.F.R. § 685.219(e)(3); *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d

20 U.S.C. § 1087e(m), the Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, §

315, 132 Stat. 348, 752-53, or applicable Department of Education regulations, as Plaintiff

and class members was denied PSLF (including TEPSLF where applicable) when he or she

applied.[53]

136.    In addition, exhaustion is not required because it would be futile.[54]   As

explained below, Plaintiff, and each member of the class, has availed himself or herself of any

available procedures to cure the denials without success.

137.    Defendants' actions give rise to an actual case or controversy within the

meaning of Article III of the U.S. Constitution.

138.    Plaintiff, and individual class members, have Article III standing to assert APA

claims and claims under the Due Process Clause of the Fifth Amendment as set forth below:

a.  The Department of Education's denials of Plaintiffs', and class members
    applications for PSLF (including TEPSLF) and the deprivation of their
    property interest in PSLF without due process of law are concrete injuries-in-
    fact.

b.   Plaintiff and individual class members, have an ongoing need for loan
    forgiveness because their federal student loan balances remain outstanding.

c.  Should they reapply, Plaintiff and class members are likely to be denied
    PSLF (including TEPSLF) in the imminent future, without sufficient process.

d.  Plaintiff and class members' concrete injuries-in-fact are fairly traceable to
    the challenged actions, namely the Department of Education's denials of
    individual Plaintiffs' applications for PSLF (including TEPSLF).

---

1, 19-24 (D.D.C. 2019).
[53] *See* 34 C.F.R. § 685.219(e)(3); *see also Darby v. Cisneros*, 509 U.S. 137, 154 (1993)
(exhaustion is a "prerequisite to judicial review *only* when expressly required by statute or when
an agency rule requires appeal before review").
[54] *See Am. Fed'n of Gov't Emps. v. Acree*, 475 F.2d 1289, 1292 (D.C. Cir. 1973) (no
requirement to exhaust administrative remedies when doing so would be "an exercise in futility").

e. Plaintiff and class members' concrete injuries are redressable by a decision of this Court: (i) declaring that the Department of Education's PSLF and TEPSLF denials violate the APA and the Due Process Clause; (ii) declaring that the Department of Education's PSLF and TEPSLF application processes deprive Plaintiff and class members of their constitutional right to due process; (iii) vacating the Department of Education's PSLF and TEPSLF denials with respect to each of the Individual Plaintiffs; (iv) remanding to the Department of Education with directions to approve each of the Plaintiffs' and class members' request for forgiveness, or, in the alternative, retaining jurisdiction and remanding to the Department of Education for further action consistent with the APA; (v) requiring the Department of Education to provide Plaintiff and class members with a decision-making process that minimizes the risk of erroneous denials and ensures a meaningful opportunity to contest denials; and (vi) requiring the Department of Education to issue a written, reasoned decision to Plaintiff and class members for any denials within a reasonable time thereafter.

139. This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this action has been brought as a class action on behalf of proposed classes each in excess of 100 members; the aggregate claims of the Class members exceed $5 million exclusive of interest and costs; and one or more of the members of each Class is a citizen of a different state than one or more Defendants.

140. Plaintiffs bring this action pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on behalf of the following proposed Classes.

141. The Class that Plaintiff seeks to represent is defined as all persons who obtained student loans in order to obtain higher education to qualify for public service jobs, including, but not limited to: teachers, nurses, police officers, firefighters, public servants[55] *etc*.; who used non-Department commercial lenders as part of the Federal Family Education Loan Program (FFEL)

---

[55] Consumer Fin. Prot. Bureau, Staying On Track While Giving Back: The Cost Of Student Loan Servicing Breakdowns For People Serving Their Communities 1 (Jun. 2017), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/201706_cfpb_PSLF-midyear-report.pdf

program, Direct Loans, FLLEP or other loans designed to provide loan forgiveness to student borrowers pursuing public service programs; who used servicers, including, but not limited to

    a.      Navient Corporation, formerly known as SLM Corporation/Sallie Mae;

    b.      Nelnet Servicing, LLC;

    c.      Pennsylvania Higher Education Assistance Agency a/k/a FedLoan Servicing,

    d.      Utah Higher Education Authority, a/k/a UHEEA,

    e.      The United States Department of Education, *etc.*;

142.    **Numerosity/Impracticability of Joinder:** The members of the Class are so numerous that joinder of all members would be impractical. The proposed Class likely contains millions of members. The precise numbers of members can be ascertained through discovery, which will include Defendants' records.

143.    **Commonality and Predominance:** There are common questions of law and fact that predominate over any questions affecting only individual members of the Class.

144.    For Plaintiffs and the Class, the common legal and factual questions include, but are not limited to the following:

    a.    Whether or not 20 U.S.C. § 1087 e(m) mandating that the Department of Education cancel the balance of interest and principal due on qualifying loans held by public servants after making 120 payments has been adhered to by the Department of Education;

    b.    Whether defendants Title IV loan servicers provided accurate guidance to borrowers regarding their eligibility for loan forgiveness;

    c.    Whether the Department of Education has engaged in arbitrary and capricious agency

action in processing errors pursuant to 5 U.S.C. § 706(2)(A);

d. Whether the Department of Education gave inadequate notice of denials pursuant to 5 U.S.C. § 555 e to persons seeking loan forgiveness;

e. Whether it was a violation of Due Process due to administrative processing errors pursuant to the Fifth Amendment to the U.S. Constitution;

f. Whether the actions of the Department of Education and defendants Title IV loan servicers, were arbitrary and capricious agency actions due to servicer misconduct, pursuant to 5 U.S.C. § 706(2);

g. Whether the Department of Education and defendants Title IV loan servicers violated the Due Process Clause through servicer misconduct pursuant to U.S. Constitution;

h. Whether the Department of Education and the named loan servicers have acted in a negligent, arbitrary and capricious actions in failing to adhere to the Congressional dictates, and directions on providing student loan forgiveness to qualifying students entering public servant professions;

i. Whether the Department of Education knew, or should have known that the defendants Title IV loan servicers were providing inaccurate, deceptive information to student borrowers;

j. Whether the defendants Title IV loan servicers were providing inaccurate, deceptive information to student borrowers;

k. Whether the Department of Education knew, or should have known that Title IV loan servicers were omitting, concealing or intentionally misleading student borrowers regarding material facts from their communications and disclosures to Plaintiff and

the Class regarding the costs, benefits, and policies surrounding PSLF;

l. Whether the Department of Education and the Title IV loan servicers engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices;

m. Whether the Department of Education, and the Title IV loan servicers actions violated consumer protection statutes;

n. Whether Plaintiffs and the Class have suffered damages; and if so, the appropriate amount thereof;

o. Whether the Title IV loan servicers were omitting, concealing or intentionally misleading student borrowers regarding material facts from their communications and disclosures to Plaintiffs and the Class regarding the costs, benefits, and policies surrounding PSLF;

p. Whether the Title IV loan servicers engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices;

q. Whether the Title IV loan servicers actions violated consumer protection statutes;

r. Whether Plaintiffs and the Class have suffered damages; and if so, the appropriate amount thereof;

s. Whether the Department of Education's denials of the Plaintiffs' and Class members PSLF (including TEPSLF) applications violate the Administrative Procedure Act and violate the Fifth Amendment's Due Process Clause;

t. Whether the Department of Education's PSLF (including TEPSLF) application processes deprive Plaintiffs and Class Members of their constitutional right to due

process by depriving them of a protected property right in PSLF;

u. Whether the Court should vacate the Department of Education's PSLF denial actions with respect to Plaintiffs and Class Members applications for loan forgiveness;

v. Whether the Court should remand to the Department of Education, with directions that the Department of Education approve each of the Class Members, and Plaintiffs' requests for forgiveness, and whether under 20 U.S.C. 1087e(m) or the Department of Education's general discharge authority, or whether in the Court should retain jurisdiction for further action with respect to each Class Member and Plaintiff consistent with the APA.

w. Whether the Department of Education and loan servicers should be required to provide notice to all Class Members who submitted PSLF and TEPSLF applications, which were denied relief sufficient notice and information to enable applicants notice to any and all applicants denied PSLF (including TEPSLF) relief sufficient to enable the applicant to determine the reason for such denial including, but not limited to, information concerning the months of alleged missed or disqualifying payments and the specific reasons the Department of Education did not count those payments, or any other basis for the denial.

x. Whether Defendant loan servicers and/or their agents and employees made the misrepresentations described above;

y. Whether the misrepresentations described above were false or misleading;

z. Whether Defendant loan servicers acted as an agent for the Department of Education;

aa. Whether Defendant loan servicers and and the Department of Education entered into

the Servicing Contracts with the intent of benefiting the members of the Classes as third-party beneficiaries;

bb. Whether Defendant Loan Servicer's misrepresentations described above constituted breaches of the Servicing Contracts;

cc. Whether Defendant Loan Servicer's had a duty of care due to its special position of confidence and trust with the members of the Classes;

dd. Whether Defendant Loan Sertiver's possessed special expertise regarding federal student loan repayment options and/or appears to possess such expertise as a result of representations made by Defendant Loan Servicers and the Department of Education;

ee. Whether Defendant Loan Servicer's received an unjust benefit to the detriment of the members of the Classes through the misrepresentations described above; and

ff. Whether, by virtue of their position as loan servicer's, Defendant Loan Servicer's owed a fiduciary duty to the members of the Classes.

145. These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual class members.

146. Plaintiffs will fairly and adequately represent and protect the interests of members of the Classes. Plaintiffs have no claims antagonistic to those of members of the Classes. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately, and vigorously protect the interests of members of the Classes.

147. Class action status is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Nationwide Injunctive Class, the

Nationwide Injunctive Class has suffered or is in imminent threat of suffering irreparable injury, the remedies available at law are inadequate to compensate the Nationwide Injunctive Class for that injury, in light of the balance of hardships a remedy in equity is warranted, and the public interest is not disserved by a permanent injunction, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Classes as a whole.

148.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**NATION WIDE CLASS**:  A. All individuals who have or had (i) FFEL, Direct, or FFELP student loans serviced by Defendant loan servicers and The Department of Education; (ii) been employed full-time by a qualifying public service employer for purposes of PSLF; and at any time (iii) contacted a Defendant loan servicer or The Department of Education regarding their eligibility for PSLF

B. Nationwide Injunctive Class:  All individuals who have (i) FFEL, Direct or FFELP student loans serviced by one of the named Defendants; (ii) ) been employed full-time by a qualifying public service employer for purposes of PSLF; and at any time (iii) contacted a Defendant loan servicer or The Department of Education regarding their eligibility for PSLF; and (iv) intend to contact one of the Defendant loan servicers or Department of Education in the future regarding their eligibility for PSLF.

149.    The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors, and assigns.

150. The Classes are composed of hundreds to thousands of individuals and thus are so numerous that joinder of all members is impracticable.

151. The Classes can be readily ascertained through public documents and records maintained by Defendants.

152. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

153. Plaintiffs' claims are typical of the claims of members of the Classes. As alleged herein, Plaintiffs and members of the Classes sustained damages arising out of Defendants' common course of unlawful conduct.

154. **Adequacy:** Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

155. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member could be too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Further, individual members of the Class do not have a significant interest in individually controlling the prosecution of separate

actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  In addition, the loan servicing defendants have engaged in misleading representations to Plaintiffs and class members relative to student loans and necessity to consolidate or other qualifying measures for PSLF relief, while simultaneously therewith the Department of Education has refused to follow Congressional direction and has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

156. Plaintiffs do not anticipate any difficulty in the management of this litigation.

157. The Department of Education has, or has access to, address and/or other contact information for the Members of the Class, which may be used for the purpose of providing notice of the pendency of this action.

## VENUE

158. Venue is proper in the District Court for the District of Utah pursuant to 28 U.S.C. § 1391 because Plaintiff and numerous Class Members reside in the State of Utah, and the Department of Education and the defendant loan servicers conduct business within the State of Utah.

## FACTUAL ALLEGATIONS

159. Plaintiffs incorporate by reference all factual allegations in paragraphs 1-158 as if set forth with full particularity herein.

160.     Congress created the Department of Education ("The Department") as a cabinet-level department in 1979 to oversee federal education programs because education "is too important to be mismanaged or denigrated within the federal government structure."[56]  The Department's role includes "guaranteeing equal access to educational opportunities" and "maintaining significant higher education loan and grant programs to open doors for all students desiring to continue their education beyond public school."[57]

161.     The founding purposes of the Department include:

    a.  "[T]o strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual;" [58]
    b.   "[T]o improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds; . . ."[59] and
    c.  "[T]o increase the accountability of Federal education programs to the President, the Congress, and the public." [60]

162.     In signing the Higher Education Act ("HEA") of 1965, which substantially expanded access to educational borrowing, President Johnson pledged that it would "swing open a new door for the young people of America," so that a student "anywhere in this great land of ours can apply to any college or any university in any of the 50 states and not be turned away because his family is poor."[61]

163.     Today, the Department is one of the world's largest lenders, with a

---

[56] S. Rep. No. 96-49 (1979).
[57] *Id*.
[58] 20 U.S.C. § 3402(1).
[59] 20 U.S.C. § 3401(6).
[60] 20 U.S.C. § 3402(7).
[61] President Johnson, *Remarks Upon Signing the Higher Education Act of 1965* (Nov. 8, 1965), https://lbjmuseum.com/higher-education-act-of-1965 / (last visited July 16, 2019).

"consumer loan portfolio . . . larger than [that of] J.P. Morgan and Bank of America."[62]

164.    As of 2018, the Department of Education's assets totaled $1.328 billion, over 90% of which is student loan receivables under the FFEL and Direct Loan Programs.[63]

165.    The Department of Education's Office of Federal Student Aid ("FSA") is a performance-based[64] organization within the Department of Education, with a congressional mandate "to improve service to students and other participants in [federal] student financial assistance programs . . . , including making those programs more understandable to students and their parents" and "to increase the accountability of the officials responsible for administering the operational aspects of these programs."[65]    FSA is responsible for administering and overseeing aid programs created by Title IV of the Higher Education Act. Under the HEA, the Secretary maintains "responsibility for the development and promulgation of policy and regulations" relating to the student financial assistance programs.    Secretary DeVos also has statutory authority to direct FSA, as a "discrete management unit" within the

---

[62] *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the House Comm. on Educ. and Labor*, 116th Cong. 5 (Apr. 10, 2019) (statement by Betsy DeVos, Secretary of Education), https://edlabor.house.gov/imo/media/doc/Secretary DeVosTestimony041019.pdf .

[63] *See* U.S. Dep't of Educ., *FY2018 Agency Financial Report* 9 (Nov. 15, 2018), https://www2.ed.gov/about/reports/annual/2018report/agency-financial-report.pdf (hereinafter "DOE, *FY2018 Agency Financial Report*").

[64] In the 1990s, the GAO designated FSA as a "high-risk agency with longstanding management problems."  Then in 1998, to improve the efficiency and effectiveness of FSA and to mitigate the mishandling of limited resources moving forward, Congress converted it to a performance-based organization that would have to meet specific objectives under the HEA. *See Federal Student Aid: Performance-Based Organization Review: Joint Hearing Before the Subcomm. on Gov't Operations of the Comm. on Oversight and Gov't Reform*, 114th Cong. 5 (Nov. 18, 2015) (statement of Hon. Virginia Foxx, Chairwoman of the Subcomm. on Higher Educ. and Workforce Training)

[65] 20 U.S.C. § 1018(a)(2).

Department, to exercise oversight of federal student loan servicers.[66]

166.    Two federal student financial assistance programs are relevant here— the Federal Family Education Loan Program ("FFEL Program") and the William D. Ford Direct Student Loan Program ("Direct Loan Program").

167.    Until 1993, all federal student loans were FFEL Loans, originated and funded almost exclusively by private lenders, insured by guaranty agencies, and reinsured by the federal government.   In 1993, through the Direct Loan Program, the federal government began originating loans directly to borrowers.   The FFEL and Direct Loan Programs operated in tandem until 2008, at which point the FFEL Program was terminated and the Direct Loan Program expanded.[67]   Although borrowers are still repaying FFEL Loans, no new FFEL Loans have been issued since June 30, 2010.[68]

168.    There were four types of FFEL Loans: (i) Subsidized Federal Stafford Loans made to eligible undergraduate students, who demonstrated financial need, to cover the costs of higher education at a college or career school; (ii) Unsubsidized Federal Stafford Loans made to eligible undergraduate, graduate, and professional students who do not have to have a demonstrated financial need; (iii) FFEL PLUS Loans made to graduate or professional students and parents of dependent undergraduate students to help pay for educational expenses not covered by other financial aid; and (iv) FFEL Consolidation Loans, which allowed the borrower to combine all eligible federal student loans into a single loan with a single loan servicer.

169.    The standard repayment term for FFEL and Direct Loans is ten years, but there

---

[66] 20 U.S.C. § 1018(a)(1).
[67] Eric M. Fink and Roland Zullo, *Federal Student Loan Servicing: Contract Problems and Public Solutions* 4 (June 25, 2014), http://emfink.net/publications/Stu- dent_Loan_Servicing.pdf .
[68] *See* DOE, *FY2018 Agency Financial Report*, *supra* note 35, at 35.

are several available repayment plans with various eligibility requirements and terms, including graduated payment amounts, payments spread over 25 years, and income-driven repayment plans, which tailor repayment obligations to the borrower's income and family size.[69]

## The Role of Federal Student Loan Servicers

170.     The statute establishing the FFEL Program authorizes an eligible lender or guaranty agency to "contract[] with another entity to perform any of the lender's or agency's functions [concerning loan programs], or otherwise delegate[] the performance of such functions to such other entity."[70] Such delegation does not "relieve the Secretary of responsibility for the administration of such functions."[71]

171.     When a borrower takes out a student loan, the borrower must first sign a Master Promissory Note ("MPN") Contract with the lender (for a FFEL Loan) or the Department of Education (for a Direct Loan), which outlines the terms and conditions of the loan, before funds are disbursed. The lender or the Department of Education may delegate or contract out the performance of its functions, including under the MPN Contract, to, among others, a servicer.[72]

172.     The FFEL Loan MPN Contract also specifically incorporates the borrower's statutory rights and applicable Department of Education regulations, stating:

> Loans disbursed under this MPN [Contract] are subject to the … [HEA] and applicable U.S. Department of Education regulations …. The terms of this MPN [Contract] will be interpreted in accordance with the applicable federal statutes and regulations, and the guarantor's policies. Applicable state law, except as preempted by federal law, may

---

[69] Income-driven repayment plans are available for both FFEL and Direct Loan borrowers. *See* 34 C.F.R. §§ 682.209, 682.215.
[70] 20 U.S.C. § 1086(a).
[71] 20 U.S.C. § 3472.
[72] 34 C.F.R. § 682.203; *see* 20 U.S.C. § 1087f.

provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN [Contract].[73]
at 2, 4.

173. The Department of Education has oversight authority over all Title IV servicers, including servicers of commercially held FFEL Loans.[74] The Department of Education's implementing regulations "apply to [any] third-party servicer that violates any statutory provision governing the FFEL programs or any regulations, special arrangements, agreements, or limitations entered into under the authority of statutes applicable to Title IV of the HEA prescribed under the FFEL programs."[75]

174. The statute establishing the Direct Loan Program authorizes the Department of Education to enter into direct contracts for "the servicing and collection of loans made or purchased."[76]

175. Currently, the Department of Education contracts with nine FFEL and Direct student loan servicers to manage its approximately $1.5 trillion student loan portfolio.[77]

176. Again, such delegation does not "relieve the Secretary of responsibility for the

---

[73] *See* Consumer Fin. Prot. Bureau, Student Loan Servicing 11 (Sept. 2015), https://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf ("Servicers generally must comply with applicable federal and state consumer financial laws and regulations and, for certain older federal student loans, regulations promulgated by the Department of Education and authorized by the Higher Education Act (HEA).")

[74] *See* U.S. Dep't of Educ., Fed. Student Aid, *Functional Statement*, https://www2.ed.gov/about/offices/list/om/fs_po/fsa/program.html#fiog (last visited July 16, 2019) (The "Financial Institution Oversight Service Group (FIOSG) is responsible for administering a program of oversight of . . . servicers participating in the [FFEL] Program," "program reviews of . . . servicers," and "monitor[ing of] . . . servicers to obtain early warning and/or confirmation of issues related to program compliance . . . .") (last visited July 16, 2019).

[75] 34 C.F.R. § 682.700(a); *see also* 34 C.F.R. § 682.203(a).

[76] 20 U.S.C. § 1087f(b)(2).

[77] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 3-4; *see also* Post-secondary National Policy Institute, *Issue Primers, Federal Student Loan Servicers* Fig. 7 (Mar. 8, 2019), http://pnpi.org/federal-student-loan-servicing / (last visited July 16, 2019).

administration of such functions."[78]

177.    According to the Department of Education, student loan servicers "are responsible for collecting payments on a loan, advising borrowers on resources and benefits to better manage their federal student loan obligations, responding to customer service inquiries, and performing other administrative tasks associated with maintaining a loan on behalf of [the Department of Education]."[79]

178.    The Department of Education informs borrowers that they can rely on their servicer to help choose the best loan repayment option for them.  The Department of Education's website tells borrowers:  "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions.  Your loan servicer will help you decide whether one of these plans is right for you."[80]

179.    The Department of Education also informs borrowers that "[t]he loan servicer will work with you on repayment plans and loan consolidation and will assist you with other tasks related to your federal student loan."[81]

180.    The Department of Education  expressly requires  loan servicers  to assist with forgiveness programs, including PSLF and TEPSLF:  "All contracted federal student loan

[78] 20 U.S.C. § 3472.
[79]    U.S.  Dep't  of  Educ.,  Fed.  Student  Aid,  *Loan  Servicing  Contracts*, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing.          (last visited July 16, 2019).

[80]    U.S.  Dep't  of  Educ.,  Fed.  Student  Aid,  *Income-Driven  Plans*, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven  (last visited July 16, 2019).
[81]    U.S.  Dep't  of  Educ.,  Fed.  Student  Aid,  *Loan  Servicers*, https://studentaid.ed.gov/sa/repayloans/understand/servicers (last visited July 16, 2019).

servicers are responsible for . . . communicating with borrowers about the general availability of the program and enrolling borrowers in selected repayment plans that may enable them to qualify for PSLF."[82]

## THE PUBLIC SERVICE LOAN FORGIVENESS PROGRAM

181.    Congress created the PSLF Program in 2007 to assist students who want "to pursue a career in public service and be able to take those jobs . . . often at lower pay" by "relieving them of the huge burden of debt they face."[83]

182.    Senator Edward Kennedy remarked on the Senate floor when the final bill was approved:

> It is the desire of so many of these young people to be involved in public service and to help respond to the needs in their communities. They want to be part of the solution, not part of the problem. So often, because of their indebtedness, they have to choose careers in order to deal with the indebtedness. So this legislation will open up or help us take advantage of that idealism that is out there. We are giving them a pathway to making a difference in terms of the future of our country, and I think that is enormously important. That is one of the most important parts of this legislation.[84]

183.    To accomplish this goal, Congress mandated that the Secretary "shall cancel" the remaining balance of all Federal Direct Loans for borrowers who meet the designated PSLF criteria.[85]

184.    The PSLF implementing regulations explain that "[t]he Public Service Loan

---

[82] *See, e.g.*, Hegji, *supra* note 5, at 22.
[83] 153 Cong. Rec. S11,245 (daily ed. Sept. 7, 2007) (statement of Sen. Sherrod Brown).
[84] 153 Cong. Rec. S11, 258 (daily ed. Sept. 7, 2007) (statement of Sen. Edward M. Kennedy).
[85] 20 U.S.C. § 1087e(m)(1).

Forgiveness Program is intended to encourage individuals to enter and continue in full-time public service employment."[86]

185.    Lawmakers of both parties have enthusiastically supported PSLF, recognizing that public servants "work tirelessly and, far too often, for much less pay than they deserve."[87]

186.    Members of Congress report that, according to their constituents—including teachers, firefighters, police officers, military veterans, prosecutors, social workers, doctors, nurses, veterinarians, and charitable employees—"PSLF has transformed their workplaces.  It helps recruit and retain top talent, making workforces more efficient . . ." and "provides the financial feasibility [borrowers] need to dedicate their careers to serving our communities in a public service capacity."[88]

187.    Likewise, the Department of Defense reports that "PSLF has been an important recruitment and retention tool for the military."[89]

188.    The Department of Education's data shows that low-to-moderate income borrowers should benefit most significantly from PSLF.[90]  In 2016, the Department of

---

[86] 34 C.F.R. § 685.219(a).

[87] Letter from Tim Kaine (D-VA) and 3 other Democratic lawmakers to the Secretary of Education (June 19, 2018), https://www.kaine.senate.gov/imo/media/doc/Kaine, %20Whitehouse,%20Duckworth,%20Hassan%20Press%20DeVos%20On%20Failure %20To%20Implement%20Public%20Service%20Loan%20Forgiveness%20Fix.pdf .

[88] *See* Letter from Brian Fitzpatrick (R-PA) and 12 other Republican lawmakers to the Chairwoman of the House Committee on Education and the Workforce (Apr. 18, 2018), https://cqrcengage.com/nea/file/NEsIK26WZXb/PSLF-Letter-FINAL.pdf.

[89] *See* U.S. Dep't of Defense, *Information Paper* (Jan. 10, 2018), https://www.insidehighered.com/sites/default/server_files/media/Department-of-Defense-on-PROS- PER-Act.pdf.

[90] *See* U.S. Dep't of Educ., *Direct Loan Public Service Loan Forgiveness* 23 (July 2016), http://fsaconferences.ed.gov/conferences/library/2016/NASFAA/2016NASFAADirect-LoanPSLF.pdf .

Education reported that nearly two thirds of borrowers on income-driven repayment plans who intended to pursue PSLF earned less than $50,000 per year.[91]

## PSLF Program Requirements

189.     The College Cost Reduction and Access Act ("CCRAA") outlines the requirements for PSLF.   Section 455 of the CCRAA mandates that "[t]he Secretary shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan not in default for a borrower who[:]

(A)      has made 120 monthly payments on the eligible Federal Direct Loan after October 1, 2007, pursuant to [an income-driven repayment plan or the standard repayment plan (or a plan with a monthly payment at least equal to the standard plan)] . . . ; and

(B)      (i)       is employed in a public service job at the time of such forgiveness; and

(ii)      has been employed in a public service job during the period in which the borrower makes each of the 120 payments described in subparagraph (A)."[92]

190.     The Department of Education promulgated regulations implementing the PSLF Program, which establish specific requirements for loan forgiveness that track Section 455(m) of the CCRAA.[93]  Pursuant to these regulations, after 120 monthly qualifying payments, "[t]he Secretary forgives the principal and accrued interest that remains on all eligible loans for which

---

[91] U.S. Dep't of Educ., *2016 FSA Training Conference For Financial Aid Professionals* 29 (Nov. 2016), http://fsaconferences.ed.gov/conferences/library/2016/2016FSAConf Session18.ppt.

[92] CCRAA § 455(m) (codified at 20 U.S.C. § 1087e(m)).

[93] 34 C.F.R. § 685.219.

loan forgiveness is requested by the borrower."[94]

191. In the public notice-and-comment period for these regulations, The Department received numerous comments focusing on borrowers' access to loan forgiveness and their ability to track their eligibility status.[95]

192. In particular, "many commenters asked the Department of Education to develop a clear and simple method for the borrower, the employer, or both, to determine annually the borrower's eligibility for public service loan forgiveness."[96]

193. In response, the Department of Education stated that it "believes that the way in which borrowers apply for and document their eligibility for the public service loan forgiveness benefit is best handled administratively. We assure the commenters that we will continue to examine ways to assist borrowers who are interested in, or already employed in public service, to determine and document their eligibility for the loan forgiveness program."[97]

194. While the Department of Education retains ultimate responsibility for administration of the PSLF Program,[98] one way it has attempted to handle these concerns administratively is by designating one servicer, FedLoan Servicing, as the "PSLF servicer." Importantly, however, only borrowers "declared on-track for PSLF"—as explained in step three

---

[94] 34 C.F.R. § 685.219(d).

[95] Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 73 Fed. Reg. 63,232 (Oct. 23, 2008).

[96] *Id.*

[97] *Id.* at 63, 241.

[98] *See, e.g.*, Compl. at ¶ 67 and Answer at ¶ 67, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. Nos. 1, 14. The Department underscores its ultimate responsibility in a public document explaining the PSLF Program, noting that FedLoan Servicing is only "responsible for administering the Public Service Loan Forgiveness (PSLF) Program on behalf of ED." U.S. Dep't of Educ., *Public Service Loan Forgiveness: Questions and Answers for Federal Student Loan Borrowers* (Dec. 2015), *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Administrative Record (hereinafter "ABA AR"), Dkt. No. 34-1, at 168.

below—"will be transferred to the PSLF servicer."[99]  Borrowers who seek loan forgiveness but have not submitted an approved Employment Certification Form ("ECF," discussed at step one below), may have their loans serviced by any of the servicers.[100]

195. PSLF qualification is supposed to work as follows:

   a. *First*, at the request of the borrower, FedLoan Servicing must provide the borrower with an ECF, an overview of PSLF eligibility requirements, and instructions for completing the ECF.[101]  Upon receipt of an ECF, the Department of Education conducts an initial review to verify the borrower provided all required information.  If the form is incomplete, the Department of Education will advise the borrower of the necessary steps to complete or correct the form.[102]

   b. *Second*, The Department of Education determines whether the employer is a "qualifying public service organization" by having FedLoan Servicing confirm that the organization is listed in The Department's database.[103]

      i. If FedLoan Servicing cannot determine whether an employer is

[99] *See infra* note 77.

[100] *See supra* note 47.

[101] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 142, 152-153.

[102] *Id*. at 153; *see also id.* at 143.

[103] Qualifying employers include: (i) government organizations; (ii) not-for-profit organizations that are tax-exempt under Section 501(c)(3) of the Internal Revenue Code; and (iii) other not-for-profit organizations that are not tax-exempt but provide certain types of qualifying public services as their primary function; it excludes (a) labor unions; (b) partisan political organizations; (c) for-profit organizations; and (d) not-for-profit organizations that are not tax-exempt and do not provide a qualifying public service as their primary function.  *See* U.S. Dep't. of Educ., Fed. Student Aid, *PSLF*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualifying-employment (last visited July 7, 2019).  As an example of ED's ultimate authority as to PSLF, ED has on rare occasions authorized FedLoan Servicing "to override judgment of public service employers, per FSA authorization and on an exception basis, to make them qualifying or not qualifying employers for the Public Service Loan Forgiveness Program."  If FedLoan Servicing does so, it is required to note "the FSA-authorized condition on the borrower account."  U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 143-44.

qualifying,[104] it must escalate the decision to The Department.[105]

    c. *Third*, as required by The Department, FedLoan Servicing determines whether the borrower worked the requisite number of hours in a public service job.[106]

        i. If a borrower is on track for PSLF—*i.e.*, is working the requisite number of hours in a public service job—that borrower's loans are transferred to FedLoan Servicing if they are not already serviced by FedLoan Servicing.[107] Once a borrower's accounts are transferred, FedLoan Servicing is to "process all forms and handle all communications regarding PSLF, as well as perform all non-PSLF related servicing functions on a borrower portfolio, as required of all federal loan servicers."[108]

        ii. The Department of Education requires FedLoan Servicing to track the number of qualifying payments made by all of the borrowers it services.[109] Both The Department and FedLoan Servicing recommend that ECFs be submitted annually so that the number of qualifying

---

[104] *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d at 12-13; U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), Appendix B (Instructions for Reviewing a PSLF Employment Certification form (ECF)), ABA AR, Dkt. No. 34-1, at 143, 160.

[105] According to ED's contract with FedLoan Servicing, if an employer is not deemed to be qualifying, "a borrower may request reconsideration." Although ED's contract with FedLoan Servicing requires it to "[d]escrib[e] the actions the borrower may take . . . if the employment cannot be determined to be qualifying, or to dispute a determination, and [t]he outcome of the initial review," there are no publicly available procedures governing this supposed "reconsideration." Answer at ¶ 64, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. No. 14; U.S. Dep't of Educ., *PSLF Single Servicer Requirements, Task Order 0005,* (Nov. 15, 2011), Amendment of Solicitation/Modification of Contract, Appendix B (Instructions for Reviewing an Employment Certification Form for PSLF) at 5.

[106] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), Appendix B (Instructions for Reviewing a PSLF Employment Certification Form (ECF)), ABA AR, Dkt. No. 34-1, at 143, 161.

[107] *Id*. at 142, 144; U.S. Dep't of Educ., Fed. Student Aid, *PSLF*, https://studentaid.ed.gov/sa/node/91#apply (last visited July 7, 2019). The Department modified this process in July 2018 pursuant to a change order to "stop immediately transferring borrowers to FedLoan Servicing once an ECF is submitted and qualifying employment is confirmed," and instead "[l]imit[ing]" "PSLF Transfers" "to at least 96 months of Quali fied Employment." U.S. Dep't of Educ., Amendment of Solicitation/Modification of Contract, No. 0021P00029, (July 23, 2018) at 2-3.

[108] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 149; *see also supra* note 77 (describing 2018 modification to timing of transfer of borrower account to FedLoan Servicing).

[109] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 144.

payments can be updated.[110]

  iii. The Department of Education instructs borrowers: "Collecting and submitting the Employment Certification form(s) while you are making the required 120 qualifying monthly payments will help you keep track of when you will be eligible to apply for PSLF."[111]

  iv. FedLoan Servicing reviews submitted ECF forms and notifies the borrower of "the number of qualifying payments the borrower has made and the remaining number the borrower must make in order to be eligible for PSLF."[112]

 d. *Fourth*, the borrower must make 120 qualifying payments toward Direct Loans to qualify for PSLF.

  i. FFEL Loans must be consolidated into a Direct Consolidation Loan in order for payments to qualify under PSLF. Any payments made prior to consolidation do not qualify.

  ii. To qualify for PSLF, payments on Direct Loans must also meet special requirements. The payments must have been made after October 1, 2007, under a qualifying repayment plan, for the full amount shown on the invoice, within fifteen days of the due date, and while employed full-time by a qualifying employer.[113] Additionally, borrowers cannot make qualifying payments while their Direct Loans are in forbearance.

 e. *Fifth*, once the borrower has made 120 qualifying payments, the borrower must complete a PSLF Application for Forgiveness and must be working full-time for a qualifying employer at the time the application is submitted and at the time the remaining balance on the loan is forgiven.[114]

196. If the borrower meets all of the above requirements, FedLoan Servicing forwards

---

[110] For example, the Department of Education advises borrowers that "[a]lthough the form is voluntary, borrowers are strongly encouraged to submit an ECF annually or whenever they change jobs to help track their progress." U.S. Dep't of Educ., Fed. Student Aid, *PSLF Data*, https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (last visited July 9, 2019). ED also tells borrowers that submitting ECFs "will help you keep track of when you will be eligible to apply for PSLF." U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 153.

[111] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 152-53.

[112] *Id.* at 153, 144-46.

[113] 34 C.F.R. § 685.219(c)(iii); *see also* U.S. Dep't of Educ., Fed. Student Aid, *PSLF*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualify (last visited July 16, 2019).

[114] Fed Loan Servicing, *PSLF*, https://myfedloan.org/borrowers/special-programs/pslf (last visited July 16, 2019).

the application to the Department of Education for final review.[115]  According to the

Department of Education's contract with FedLoan Servicing, "[o]nce [the Department of

Education] determines whether all of the requirements for eligibility have been fulfilled, the

balance of principal and interest due on the borrower's eligible Direct Loans shall be

forgiven."[116]

197.    Pursuant to the PSLF implementing regulations, "[i]f the Secretary determines

that the borrower does not meet the eligibility requirements for loan forgiveness under this

section, the Secretary resumes collection of the loan and grants forbearance of payment on both

principal and interest for the period in which collection activity was suspended.  The Secretary

notifies the borrower that the application has been denied, provides the basis for the denial, and

informs the borrower that the Secretary will resume collection of the loan."[117]

198.    The Department of Education retains ultimate responsibility for all key steps in

the process of determining eligibility. As the Department of Education acknowledges, "the

Department has the ultimate authority to review FedLoan Servicing's actions under its

contract."[118]  The Department of Education "has never delegated final decision-making

authority under the PSLF Program to FedLoan Servicing or any other entity."[119]

199.    Critically, however, the Department of Education provides no process for a

---

[115] *See* Hegji, *supra* note 5, at 6.
[116] U.S. Dep't of Educ., *PSLF Single Servicer Requirements, Task Order 0005,* (Nov. 15, 2011),
Amendment of Solicitation/Modification of Contract, Appendix B (Instructions for Reviewing an
Employment Certification Form for PSLF) at 1-2.

[117] 34 C.F.R. § 685.219(e)(3).
[118]  Answer at ¶ 66, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. No. 14.
[119] Compl. at ¶ 67 and Answer at ¶ 67, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt.
Nos. 1, 14.

borrower to challenge or appeal the denial of PSLF, nor does the Department of Education have any process by which it reviews and corrects mistakes made by the Department of Education or Title IV servicers regarding PSLF.

200.     The CFPB estimates that approximately one in four U.S. workers is employed in public service[120] and that, "[b]y the end of 2016, more than 32 million borrowers were repaying loans that [we]re potentially eligible for PSLF."[121]

201.     Yet, according to the latest available data, as of March 2019, 73,554 unique borrowers had submitted 86,006 applications for PSLF, and only 864 applications had been approved for forgiveness. Only 518 borrowers—fewer than 1% of unique borrowers submitting applications—have had their loans forgiven.[122]  These numbers make clear that The Department has failed to fulfill its congressional mandate to administer PSLF effectively, to the detriment of the Individual Plaintiffs, AFT members, and countless public servants across the nation.

202.     Recognizing the PSLF Program's failures, in January 2018, a bipartisan group of lawmakers authorized $350 million to be available on a first-come, first- served basis as a temporary expansion of PSLF,[123] which is available to borrowers who hold Direct Loans but made some or all of their 120 payments on a non-qualifying repayment plan, and whose last 12 payments were greater or equal to what they would have paid on an income-driven repayment plan.[124]

---

[120] *See* CFPB, *Staying on Track*, *supra* note 3, at 1
[121] *See id.* at 20 n.34.
[122] FSA, *March 2019 PSLF Report*, *supra* note 2.
[123] Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, 132 Stat. 424, Div. H, tit. III, § 315 (2018), 405-06, https://www.congress.gov/115/bills/hr1625/BILLS115hr1625enr.pdf .
[124] *Id.*

203. This expansion requires forgiveness if the statutory qualifications are met: The authorizing statute provides that the Department of Education "shall develop and make available a simple method for borrowers to apply for loan cancellation under this section within 60 days of enactment of this Act."[125]

204. FedLoan Servicing and the Department of Education instruct borrowers to apply for TEPSLF by "[p]repar[ing] an email to FedLoan Servicing requesting that The Department reconsider your eligibility for PSLF."[126]

205. The Department of Education, through FedLoan Servicing, then reviews the application and determines whether to grant TEPSLF.[127]

206. The Department of Education provides no process for a borrower to challenge or appeal the denial of TEPSLF, nor does The Department have any process by which it reviews and corrects mistakes made by The Department or the Title IV servicers regarding TEPSLF.

207. Although Congress intended TEPSLF to facilitate the forgiveness of certain public employee loan debt, as of the end of March 2019, only 442 requests out of 12,429 requests considered—3.6%—were approved for TEPSLF, accounting for $17,557,594 in debt relief.[128]

208. The Department of Education's administration of TEPSLF is also a failure.

---

[125] *Id.* ED implemented TEPSLF through a new information collection under the Paperwork Reduction Act of 1995. *See* Notice, Agency Information Collection Activities; Comment Request; Temporary Expansion of Public Service Loan Forgiveness (TEPSLF), 83 Fed. Reg. 24,091 (May 24, 2018).

[126] U.S. Dep't of Educ., Fed. Student Aid, *TEPSLF*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service/temporary-expanded-public-service- loan-forgiveness   (last visited July 16, 2019).

[127] *Id.*

[128] FSA, *March 2019 PSLF Report*, *supra* note 2.

209. The Department of Education possesses what is known as Compromise and Settlement authority, which allows the Department of Education to compromise or waive any title or claim.

210. This power allows the Department of Education to settle with student loan borrowers who are not eligible for forgiveness because the Department of Education or the Title IV servicers have given the borrower incorrect information about how to qualify.

211. The Department of Education's Compromise and Settlement authority for FFEL Loans is set forth in the HEA, 20 U.S.C. § 1082(a)(6), which allows the Secretary to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption."[129]

212. The Department of Education maintains the same authority over the Direct Loan Program,[130] and under the Department of Education's regulations, "the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the [FFEL Program or the Direct Loan Program]."[131]

213. There is little public information about the Department of Education's use of its Compromise and Settlement authority, but the Department of Educations has provided internal

---

[129] Under 20 U.S.C. § 1082(a)(4), the Secretary has the authority to "consent to modification, with respect to rate of interest, time of payment of any installment of principal and interest or any portion thereof, or any other provision of any note or other instrument evidencing a loan which has been insured by the Secretary under this part."

[130] 20 U.S.C. § 1087a(b)(2).

[131] 34 C.F.R. § 30.70(e)(1); *see also* 34 C.F.R. § 30.70(e)(2) ("The Secretary refers a proposed compromise, or suspension or termination of collection, of a debt that exceeds $1,000,000 and that arises under a loan program described in paragraph (e)(1) of this section to the Department of Justice for review. The Secretary does not compromise, or suspend or terminate collection of, a debt referred to the Department of Justice for review until the Department of Justice has provided a response to that request.").

guidelines to the agencies that guaranty FFEL Loans (these agencies are called "guaranty agencies," and include state entities),[132] as well as private collection agencies ("PCAs") charged with collecting defaulted FFEL and Direct Loans.

214. For instance, the Department of Education issued Standard Compromise and Write-Off Procedures in 1993 to the agencies that guarantee FFEL Loans, which allow for a waiver of collection costs and up to 30% of the principal and interest.[133] and the Department of Education's manual of procedures for PCAs makes clear that the Department of Education maintains authority to enter into discretionary compromises and cancel any student loan.[134]

215. Even though borrowers must make 120 qualifying payments to be eligible for

---

[132] *See* U.S. Dep't of Educ., Fed. Student Aid, *FFEL Program Lender and Guaranty Agency Reports*, https://studentaid.ed.gov/sa/about/data-center/lender-guaranty (last visited July 16, 2019).

[133] *See* National Consumer Law Center, *No Way Out: Student Loans, Financial Dis- tress, and the Need for Policy Reform* 18 n.40 (June 2006) (hereinafter "NCLC, *No Way Out*"), https://www.studentloanborrowerassistance.org/wp-content/uploads2013/05/nowayout.pdf . (citing Letter from Jean Frohlicher, President of the Council of Higher Education Loan Programs, Inc., re: Compromise and Write-Off Procedures (Nov. 7, 1993), with attached approval by Robert W. Evans, Director, Division of Policy Development (Nov. 24, 1993), and attached Standardized Compromise and Write- Off Procedures). ED has not publicly indicated whether these guidelines are still in existence or have been modified. *See* Natalie Korman, *Is it Possible to Settle Student Debt for Less than You Owe?*, The College Investor (May 23, 2019), https://thecollegeinvestor.com/20332/settle-student-debt/ . (last visited July 16, 2019); Student Loan Borrower Assistance, *Settlement*, https://www.studentloanborrowerassistance.org/loan-cancellation/settlement/ (last visited July 8, 2019); *see also* NCLC, *No Way Out* at 18.

[134] U.S. Dep't of Educ., Fed. Student Aid, *PCA Procedures Manual*, 55 (May 10, 2016), https://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/pca- manual.pdf ; U.S. Dep't of Educ., Fed. Student Aid, *PCA Procedures Manual: 2009 ED Collections Contract* 72 (Sept.2009), https://www.studentloanborrowerassistance.org/wp-content/uploads/2007/0302009-pca-procedures.pdf ; *see also* Student Loan Borrower Assistance, *Settlement*, https://www.studentloanborrowerassistance.org/loan-cancellation/settlement/ (last visited July 16, 2019).

PSLF, the Department of Educ of Education has done nothing to ensure that borrowers' payments are correctly counted despite documented knowledge of repeated errors with disastrous consequences for borrowers.

216.    For example, it took almost five years after PSLF was enacted for ED to introduce the ECF,[135] which allows borrowers to verify that their employer qualifies under the PSLF Program, a crucial step in making sure borrowers are on track to qualify.[136]

217.    According to the GAO, the Department of Education "has not provided [FedLoan Servicing] with a comprehensive source of guidance and instructions on how to operate the [PSLF] program, raising the risk that [FedLoan Servicing] may improperly approve or deny borrowers' certification requests and forgiveness applications."[137]

218.    The GAO's investigation concluded that "[the Department of Education] has not ensured the PSLF servicer is receiving consistent loan payment history information from other loan servicers, increasing the risk of inaccurate qualifying payment counts."[138]

219.    The GAO further found that the Department of Education has failed to provide FedLoan Servicing and borrowers with sufficient information to determine whether a borrower's employer qualifies as a public service employer, leaving FedLoan Servicing's assessments as to

---

[135] U.S. Dep't of Educ., Fed. Student Aid., *Federal Student Aid Posts Updated Reports to FSA Data Center* (Aug. 22, 2016), https://ifap.ed.gov/eannouncements/082216FSAPostsUpdatedReportstoFSADataCenter.html ("Although no borrower will be eligible for forgiveness under this program until October 2017, the Department introduced a voluntary Employment Certification Form in January 2012 to help borrowers track their progress toward meeting PSLF requirements.").

[136] *See* U.S. Dep't of Educ., Fed. Student Aid, *PSLF Data*, https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (last visited July 16, 2019); U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 142

[137] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 24.

[138] *Id*. at 25.

public service employment "vulnerable to inconsistencies" and fostering "uncertainty for borrowers" as to whether they will qualify for PSLF.[139]

220.     Specifically, although the Department of Education has identified data sources for FedLoan Servicing to consult to determine if an employer is qualifying, the GAO found that "th[os]e sources are not comprehensive," resulting in FedLoan Servicing using other sources "that have significant limitations" and "have not been fully reviewed or assessed for accuracy by ED."[140]

221.     The GAO found similar "inconsistencies in the information used for counting borrowers' qualifying loan payments," "rais[ing] the risk of errors" in the PSLF application review process.[141]

222.     In reviewing PSLF applications, FedLoan Servicing must "examine the borrower's prior loan payment information to determine which prior payments count towards the 120 needed to qualify for loan forgiveness."[142]

223.     If FedLoan Servicing receives the borrower's account from another servicer (as is often the case), the initial servicer must transfer loan payment information to FedLoan Servicing so that the borrower's earlier payments are counted.

224.     The GAO's investigation found that this process of transferring information is replete with errors. For example, even though the Department of Education created standardized templates for servicers to use in transferring loan and prior payment information to FedLoan Servicing, these templates lack "standard definitions and terminology," "resulting in

---

[139] *Id*. at 24.
[140] *Id*. at 18.
[141] *Id*. at 25.
[142] *Id*. at 21.

inconsistencies in the data other loan servicers report" to FedLoan Servicing.[143]

225. When FedLoan Servicing "does not receive consistent and reliable information from other servicers," there are "inconsistencies in borrowers' payment history data,"[144] which "increase[es] the risk of inaccurate qualifying payment counts."[145]

226. The GAO's findings on inconsistent payment counting mirror those in a 2017 report from the CFPB.

227. According to the CFPB, borrowers have complained that "their servicer provides inaccurate counts of qualified payments" and that "their previous qualifying payments may not be reflected in the payment histories maintained by [FedLoan Servicing]."[146]

228. FedLoan Servicing officials have stated "they rely on borrowers to catch any payment counting errors resulting from issues with information provided by other loan servicers."[147] But the GAO concluded, as outlined in the Figure below, that the risk of an inaccurate count is "compounded by the fact that [the Department of Education] does not require [FedLoan Servicing] to provide borrowers with details on which payments qualified and which did not."[148]

---

[143] *Id.*
[144] *Id.* at 21-22.
[145] *Id.* at 25.
[146] *See* CFPB, *Staying on Track*, *supra* note 3, at 39-40.
[147] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 23.
[148] *Id.* at 25.



**Figure 7: Hypothetical Example of the PSLF Servicer's Payment Counting Process and Information Shared with Borrowers**

Source: GAO analysis of documents from the Department of Education and the Public Service Loan Forgiveness (PSLF) Servicer. | GAO-18-547

229.     The CFPB has also found that borrowers "struggle to get their servicer to correct [payment counting] error[s] or explain why payments were not qualified."[149]  "This makes it difficult for borrowers to detect erroneous counts that could ultimately affect their eligibility for loan forgiveness."[150]

230.     The Department of Education has acknowledged that more work is required to "ensure borrowers receive sufficiently detailed information regarding counts of qualifying payments and their repayment history" and claims that it is "reviewing all PSLF borrower communications to improve content and clarity."[151]  It has failed to do so.

231.     Similar problems plague the TEPSLF application process, as a number of U.S.

---

[149] *See* CFPB, *Staying on Track*, *supra* note 3, at 39.
[150] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 25.
[151] Questions Submitted by Sen. Patty Murray Regarding PSLF Outreach and Compliance with Congressional Directive 8 (undated),
https://www.help.senate.gov/imo/media/doc/SenMurrayQFRresponses32819LHHShearing.pdf .

Senators have noted in a letter to Secretary DeVos.[152]  As members of Congress have admonished Secretary DeVos, ED has not taken "any significant action to make it easier for borrowers who had ended up in the wrong repayment plans to qualify for the loan forgiveness opportunity that was created for them."[153]

232.     As the GAO concluded, this breakdown in the Department of Education's assessment of PSLF and TEPSLF applications has caused, and continues to cause, public servants "to make more payments than necessary before receiving loan forgiveness,"[154] if they receive it at all.

233.     The Department of Education's processing errors—errors wholly unrelated to the borrower's eligibility and not caused by the borrower's action or inaction—result in numerous qualified borrowers being wrongfully denied their right to PSLF.  The consequences for these borrowers—all public servants saddled with exceedingly burdensome student debt—have been devastating.

234.     Nellie Christensen took out several student loans with Nelnet to pay for her undergraduate and graduate education at the University of Utah.  Plaintiff began working as a full-time teacher in 2002 and worked for over 10 years in the Granite School District, in West Valley City, Utah. The loans were consolidated by UHEAA to provide her PSLF loan forgiveness

---

[152] Letter from Tim Kaine (D-VA) and 3 other Democratic lawmakers to the Secretary of Education (June 19, 2018), https://www.kaine.senate.gov/imo/media/doc/Kaine,%20Whitehouse,%20Duckworth,%20Hassan%20Press%20DeVos%20On%20Failure%20To%20Implement%20Public%20Service%20Loan%20Forgiveness%20Fix.pdf .

[153] Letter from Tim Kaine (D-VA) and Sheldon Whitehouse (D-RI) to the Secretary of Education (Apr. 25, 2019), https://www.kaine.senate.gov/press-releases/kaine-and- whitehouse-call-on-devos-to-fix-missteps-with-implementation-of-tepslf-program  (last visited July 16, 2019).

[154] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 25.

qualification in 2004.

235.     Mrs. Christensen made over 120 qualifying payments and submitted a PSLF application and was denied loan forgiveness.

236.     Mrs. Christensen made numerous telephone calls to PSLF "specialists" who informed her she was denied relief under both PSLF and TEPSLF programs.

237.     When applying for the loans, and going through the mandatory FAFSA loan application process, she was repeatedly informed that if she became a teacher (public servant) and made 120 loan payments, that her balance and interest would be forgiven under the government's loan forgiveness plan for public servants.

238.     Based upon the representations made to her, she incurred debt and relying on the representations took out the loans necessary to acquire her undergraduate and master's degrees.

239.     Plaintiff suffered damages in loss of money in continued loan payments, as a direct and proximate result of the Department of Education's arbitrary and capricious refusal to grant Plaintiff loan forgiveness, as promised.

240.     Plaintiff is eligible for PSLF.

241.     Plaintiff  Marc Futterman knew he wanted to go into public service and took out student loans through Citibank, Sallie Mae and others to finance his education.

242.     Futterman started working with the Internal Revenue Service in 2005 before accepting his current position with the Federal Bureau of Investigation.

243.     After many calls to his various loan servicers he received conflicting, misleading information as to the status of what he was led to believe was his PSLF loan, and in 2018 was informed the only way he could receive any benefit under the PSLF program was by

consolidating his loans into a direct loan program.

244. Mr. Futtermn was told that he had few, if any qualifying payments, and has attempted to make 2-3 payments per month to try to reduce a loan that should have been forgiven, but for the negligent and misleading information he received from Department of Education approved loan servicers.

245. Gregory Wilson originated student loans through Navient at which time he was employed as a government employee in the Peace Corps and made it crystal clear that he wanted his loans to qualify for PSLF benefits as he was a government employee and intended on remaining PSLF qualified.

246. Mr. Wilson received no information, or instruction, on obtaining pre certification certificates, or current certificates from his employers from Navient.

247. In 2017 his loan was transferred to FedLoan and it was not until that time that he became aware of the employer certification requirements. Mr. Wilson had to backtrack his former employers and obtain the certification certificates.

248. Plaintiff Wilson requested FedLoan to advise him of how many qualifying payment counted toward the program and was informed it would take 60 days to provide him with the number of qualifying payment.

249. Plaintiff Wilson heard nothing from FedLoan within the 60 day period and began calling 2-3 times a month for the next 10 months, receiving inaccurate, contradicting and wrong information on the number of payments made.

250. Plaintiffs Wilson, Futterman and Christensen were all mislead by Department of Education, and the loan servicing agents and given inaccurate information on the number of

qualifying payments, types of qualifying programs, and intentionally mislead as to being in a PSLF qualifying loan.

251.    Pursuant to the Servicing Contracts entered into between defendant loan servicers and the Department of Education, the loan servicers were delegated the duties of lenders for FFEL Loans and the duties of the Department of Education for Direct Loans, specifically, "to manage all types of [federal] student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." *See,* footnote 20.

252.    In carrying out those duties, Navient, and the other defendant loan servicers were obligated to comply with all requirements of the Higher Education Act and any statutory provisions or regulations governing the FFEL Program as authorized by the Higher Education Act.

253.    The Statement of Objectives of the Defendant Loan Servicing Contracts states, "Recent legislation … enabled the Department to accept former … [FFEL] loans in the form of additional Direct Loan … capacity, and to purchase [FFEL] loans as far back as 2003, in an effort to bring liquidity and stability back to the student loan market.... With the sudden increase in current and potential loan volume that the Department will be responsible for servicing, the need for increasing the … student aid servicing vehicles is determined appropriate at this time." *Id.* at 20.

254.    The loan servicing contracts entered into between the Department of Education and the defendant loan servicers, required the loan servicers to: meet all statutory and legislative requirements; provide innovative measures and incentives to be based on performing assets, rather than transaction or activity based delinquency incentives; being responsible for

maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur; remaining flexible enough to handle new requirements generated by Congress and respond to legislative mandates and policy changes. *See, for example*, footnote 20.

255. The Servicing Contracts between the Department of Education and defendant loan servicers govern loan servicers interactions and communications with borrowers including providing accurate information for each individual borrower about repayment plans, and forgiveness options.

256. According to the Department of Education's press statement surrounding the release of the 2014 Servicing Contract, the modifications were implemented "to strengthen incentives for them to provide excellent customer service and ***help borrowers stay up-to-date on their payments***. This action will help ensure that ***borrowers receive the highest quality support*** as they repay their federal student loans and help [the Department of Education] better monitor the performance of loan servicers to help them continue to improve."[155] At a minimum, the Department of Education's statements make clear that defendant loan servicers were obligated, under the Servicing Contracts, to provide truthful information that would materially benefit borrowers.

257. Borrowers, including Plaintiffs and all those similarly situated, are thus intended third-party beneficiaries of the Servicing Contracts.

258. The federal student loan repayment processes are opaque and enormously

---

[155] U.S. Dep't of Educ., *U.S. Department of Education Strengthens Federal Student Loan Servicing* (Aug. 29, 2014), https://www.ed.gov/news/press-releases/us-department-education-strengthens-federal-student-loan-servicing.

complex. Because the Department of Education has contracted defendant loan servicers to assist borrowers, borrowers must turn to defendant loan servicers to guide them through the options for repaying their federal student loans.

259. The Department of Education and the defendant loan servicers unsuccessfully try to tell borrowers that the loan servicers have a material role in assisting borrowers—including public service borrowers—that extends far beyond simply collecting payments and processing paperwork.

260. According to the Department of Education's informational website directed at federal student loan borrowers: "A loan servicer is a company that handles the billing and other services on your federal student loan. The loan servicer will work with you on repayment plans and loan consolidation and will assist you with other tasks related to your federal student loan. It is important to maintain contact with your loan servicer. If your circumstances change at any time during your repayment period, your loan servicer will be able to help."[156]

261. The Department of Education's informational website also states: (a). Student loan servicers "are responsible for collecting payments on a loan, advising borrowers on resources and benefits to better manage their federal student loan obligations, responding to customer service inquiries, and performing other administrative tasks associated with maintaining a loan on behalf of the U.S. Department of Education."[157]  (b). "Contact your servicer to apply for income-driven replacement plans, student loan forgiveness, and more."[158]

---

[156] U.S. Dep't of Educ., *Loan Servicers*,  https://studentaid.ed.gov/sa/repay-loans/understand/servicers  (last visited July 19, 2019).

[157] U.S. Dep't of Educ., *Loan Servicing Contracts*, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing   (last visited July 19, 2019).

[158] U.S. Dep't of Educ., *Income-Driven Plans*,

(c). "How do I apply to have my loan forgiven, canceled, or discharged? Contact your loan servicer if you think you qualify."[159] (d). "If you believe that your application [for PSLF] was denied in error, contact your loan servicer for more information."[160]

262. In a report issued on September 21, 2017, the Department of Education's Federal Student Aid office stated that if a borrower's Employment Certification Form is denied because the borrower is in the incorrect repayment plan, "the borrower will be counseled to switch to a PSLF-eligible repayment plan if he or she is otherwise eligible for PSLF (i.e. eligible loans and qualifying employment)."[161]

263. In reality, the defendant loan servicers are incentivized to prevent borrowers from enrolling in PSLF in order to retain more fees and revenue for themselves in at least three ways. *First*, as outlined above, the Health Care and Education Reconciliation Act of 2010 provided FFEL borrowers incentives to consolidate their FFEL Loans into Direct Loans, with the Department of Education offering a discount of 0.25% interest on the resulting Direct Loan. When a borrower consolidates a FFEL Loan into a Direct Loan, the owner of the FFEL Loan faces an immediate loss of revenue from the prepayment of that FFEL Loan—a result defendant loan servicers wants to avoid this scenario.

264. *Second*, defendant loan servicers pool individual FFEL Loans held in their portfolios into securitized trusts, often referred to as SLABS, which are then sold to investors.

---

https://studentaid.ed.gov/sa/repayloans/understand/plans/income-driven  (last visited July. 19, 2019).

[159] U.S. Dep't of Educ., *Forgiveness, Cancellation, and Discharge*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation  (last visited July 19, 2019).

[160] *Id.*

[161] Matt Sessa, *Federal Student Aid Posts New Reports to FSA Data Center* (Sept. 21, 2017), https://ifap.ed.gov/eannouncements/092117FSAPostsNewReportsToFSADataCenter.html

The net interest income earned by SLABS, backed by FFEL Loans are often defendant loan servicers greatest source of revenue.[162]  For example, according to Navient's 2017 10-K, "we generate revenue primarily through net interest income on the FFEL[] Loan portfolio (after provision for loan losses). This segment is expected to generate significant amounts of earnings and cash flow over the remaining life of the portfolio.… Navient's goal is to maximize the amount and optimize the timing of the cash flows generated by its FFEL[] Loan portfolio. Navient also seeks to acquire FFEL[] Loan portfolios from third parties to add net interest income and servicing revenue…. As a result of the long-term funding strategy used for our FFEL[] Loan portfolio and the insurance and guarantees provided on these loans, the portfolio generates consistent and predictable cash flows."[163]  Therefore, when FFEL Loans prepay, the defendant loan servicers face another immediate loss of revenue.

265.    *Third*, defendant loan servicers are paid fees out of loan payments made by Plaintiffs and similarly-situated borrowers.  If the loan servicer is the servicer of that loan and the borrower pursues the PSLF program, the borrower's loan would be transferred to FedLoan Servicing and the other defendant loan servicer would lose the right to service the loan.

266.    By preventing consolidation of FFEL loans or preventing Direct Loan borrowers from pursuing PSLF by completing their Employment Certification Forms, defendant loan servicers benefit from the extra fees they would not have otherwise collected had borrowers been given correct information.

267.    As the GAO has explained, "Because servicers are not compensated for their loss

---

[162] Jack Remondi, *It's Time To Put Students First*, MEDIUM (May 23, 2016), https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e.
[163] *See* Navient Corp., 2017 Annual Report, *supra* note 15.

when a loan is transferred, in effect, they are paid less than if they were able to keep all of their assigned loans. Education officials acknowledged that the lack of compensation for transferred loans could be a disincentive for servicers to counsel borrowers about loan consolidation and PSLF."[164]

268.    As a result of these severely misaligned incentives, when borrowers inquire about the PSLF, defendant loan servicers are incentivized to prevent borrowers from enrolling in or certifying their intent to pursue the PSLF program.

269.    Defendant loan servicers are paid a set monthly amount for each loan they service, based on the status of the loan.  Defendant loan servicers' compensation decreases as a loan becomes more seriously delinquent.  The Servicing Contracts' fixed cap on the total revenue a servicer can earn from the Department of Education creates an incentive for the loan servicers to minimize costs as a way to maximize profits.[165]

270.    Loan Servicers training programs, monitoring programs, and compensation plan for its customer service employees encourages these employees to minimize the amount of time they spend discussing borrowers' repayment options.  For example, according to loan servicer Navient, it has "developed extensive training programs and call flow procedures to guide representative discussions with borrowers," and it "regularly assess[es] representative adherence with [its] policies and practices."[166]

---

[164] U.S. GAO, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service And Oversight: Highlights*, Report No. GAO-16-523, at 23 (May 16, 2016).
[165] Eric M. Fink and Roland Zullo, *Federal Student Loan Servicing: Contract Problems and Public Solutions* 4 (June 25, 2014), http://emfink.net/publications/Student_Loan_Servicing.pdf .
[166] Jessica Silver-Greenberg, Stacy Cowley, and Natalie Kitroeff, *When Unpaid Student*

271.    Defendant loan servicers compensate customer service representatives and pre-default collections employees using employee incentive plans. Those incentive arrangements are based, in part, on the employee's average call time. Therefore, those employees have an economic incentive to avoid engaging in lengthy conversations with a borrower about his/her financial situation and determining which repayment plan is the best option for the borrower.

272.    Because a borrower is required to submit an application along with income documentation in order to enroll in an income-driven repayment plan, the process of ensuring that a borrower is enrolled can result in multiple phone conversations.

273.    According to a survey by the CFPB, more than half of borrowers with loan servicer Navient as their servicer, who attempted to enroll in an income-driven repayment plan for the first time reported that they were unable to navigate the application process independently.[167]  Defendant Navient has even acknowledged that "technical barriers like a 10-page government application, which only the borrower not the servicer can complete, add to the burden for the very borrowers these [income-driven repayment] plans were meant to help."[168]

274.    Unfortunately, defendant loan servicer customer service employees often do not provide assistance to borrowers seeking help filling out these forms.  For instance, one Navient customer service representative noted that other representatives sometimes *simply hung up* on borrowers rather than answering their questions about income-driven repayment forms.[169]

*Loan Bills Mean You Can No Longer Work*, N.Y. TIMES (Nov. 18, 2017), https://www.nytimes.com/2017/11/18/business/student-loans-licenses.html .

[167] Complaint for Permanent Injunction and Other Relief ¶ 44, *Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa. Mar. 24, 2017), ECF No. 1.

[168] Remondi, *Five Recommendations For Better Student Loans*, *supra* note 1.

[169] Molly Hensley-Clancy, *How America's Student Loan Giant Dropped The Ball*, BUZZFEED NEWS (Feb. 13, 2017), https://www.buzzfeednews.com/article/mollyhensleyclancy/how-things-

275.     Also according to the CFPB, between January 1, 2010 and March 31, 2015, nearly 25% of borrowers who ultimately enrolled in an income-driven repayment plan with a $0 payment were enrolled in voluntary Forbearance within the twelve-month period immediately preceding their enrollment in an income-driven repayment plan. During that same time period, nearly 16% of borrowers who ultimately enrolled in the specific income-driven repayment plan PAYE with a $0 payment were enrolled in voluntary Forbearance within the twelve-month period immediately preceding their enrollment in PAYE. The majority of these borrowers were enrolled in voluntary Forbearance for a period that exceeded three months immediately preceding their enrollment in the income-driven repayment plan.

276.     Because these borrowers were placed in Forbearance, they suffered negative consequences including: (i) delayed access to lower monthly payments; (ii) failure to make qualifying payments for PSLF; and (iii) the addition of interest to the principal balance of the loan that could have been avoided if the borrower had been enrolled in an income-driven repayment plan.

## DEPARTMENT OF EDUCATION'S DISREGARD OF SERVICER MISREPRESENTATIONS TO BORROWERS REGARDING PSLF

277.     Plaintiffs contend that the Department of Education knows of—but completely disregards—repeated misrepresentations made by defendants Title IV servicers to borrowers who are attempting to qualify for PSLF or TEPSLF, resulting in unwarranted denials of loan forgiveness.

278.     In a March 2019 report, the Department of Education disclosed that two of the

went-wrong-at-americas-student-loan-giant .

most common reasons for denials of PSLF are: (1) failures to make 120 payments under a qualifying repayment plan (53% of rejections) and (2) non-eligible loans (16% of rejections).[170]

279.    Both grounds for denial are, in many instances, attributable to erroneous information that defendant Title IV servicers provided to borrowers.

280.    Though the Department of Education has decided to delegate much of the day-to-day administration of PSLF to Title IV servicers, including the task of providing information to borrowers regarding the PSLF Program's eligibility requirements, the Department of Education retains full responsibility for implementation of PSLF, as Congress made clear.[171]

281.    Thus, the Department of Education is responsible for and obligated to address Title IV servicers' misconduct that harms PSLF-seeking borrowers.  For example, as to Title IV servicers under contract with the Department of Education, the Department of Education's Inspector General testified to Congress, "[the Department of Education] must effectively monitor performance to ensure that it receives the correct quantity and quality of products or services for which it is paying."[172]

282.    The Department of Education's  contracts with those servicers recognize this too, specifying that servicers "shall provide [the Department of Education's Office of Federal Student Aid ("FSA")] the ability to monitor phone calls remotely," "shall support quarterly monitoring reviews completed by FSA," and "shall support annual program compliance reviews done by

---

[170] FSA, *March 2019 PSLF Report*, *supra* note 2.
[171] 20 U.S.C. § 3472.
[172] *Management Challenges Facing the U.S. Dep't of Educ.: Hearing Before the Sub- comm. on Labor, Health, and Human Servs., Educ., and Related Agencies*, 113th Cong. 4 (Mar. 19, 2013) (testimony of Kathleen S. Tighe, Inspector General), https://www2.ed.gov/about/offices/list/oig/auditrpts/testimony03192013.pdf .

FSA, or by an agent of FSA,"[173] and Secretary DeVos has assured Congress that the Department of Education "will continue to monitor the servicers to make sure they are upholding the agreements they have made on behalf of the students."[174]

283. The Department of Education is well aware of the widespread misrepresentations that Title IV servicers are making to borrowers regarding eligibility for PSLF. As discussed above, both the GAO and OIG have documented not only the existence of rampant servicer misconduct, but also The Department's awareness of such misconduct.[175] And yet, the Department of Education has failed to correct the problem or take it into account in administering PSLF.

284. In the face of this abdication of responsibility, Title IV servicers continue to mislead public servants and the magnitude of the problem continues to worsen.

285. For instance, the OIG report found that "FSA had not established policies and procedures that provided reasonable assurance that the risk of servicer non-compliance with requirements for servicing federally held student loans was mitigated."[176]

286. An analysis of nearly 350 FSA monitoring reports revealed that over 60% of them documented instances of servicer noncompliance with federal requirements, "includ[ing] noncompliance with requirements relevant to forbearances, deferments, income-driven

---

[173] U.S. Dep't of Educ., *Additional Servicer—Intermediate Requirements,* Attachment A-2 (June 17, 2009), at 11.

[174] *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the H. Comm. on Educ. and Labor*, 116th Cong. (Apr. 10, 2019) at 00:37:38 (testimony of Betsy DeVos, Secretary of Education), https://www.c-span.org/video/?459644-1/education-policy-hearing-secretary-devos (last visited July 16, 2019).

[175] *See generally* GAO, *Public Service Loan Forgiveness Report*, *supra* note 6; OIG, *Federal Student Aid*, *supra* note 7.

[176] OIG, *Federal Student Aid*, *supra* note 7.

repayment, interest rates, due diligence, and consumer protection."[177]

287.     Although "FSA's oversight activities regularly identified instances of servicers not servicing federally held student loans in accordance with Federal requirements, . . . FSA management rarely used available contract accountability provisions to hold servicers accountable for instances of noncompliance."[178]

288.     The OIG further concluded that because the Department of Education "rarely hold[s] servicers accountable for instances of noncompliance with Federal loan servicing requirements, FSA is not providing servicers with incentive to take actions to mitigate the risk of continued noncompliance that harms students and their families."[179]

289.     The Department of Education's lack of enforcement as to noncompliant loan servicers indicates that the Department of Education is failing to carry out Congress's mandate of ensuring that borrowers have access to the PSLF entitlement.

290.     The 2018 GAO Report further revealed the Department of Education's glaring failures with respect to Department of Education's administration of PSLF.[180]

291.     The report found the Department of Education knew there was a high risk that FedLoan Servicing would improperly approve or deny certification requests and applications for loan forgiveness yet took no action to correct these problems.[181]

292.     The report further found that Department of Education's inaction "makes the PSLF servicer's employer assessments vulnerable to inconsistencies and fosters uncertainty for

---

[177] *Id*. at 4.
[178] *Id*. at 2.
[179] *Id*. at 17.
[180] *See generally* GAO, *Public Service Loan Forgiveness Report*, *supra* note 6.
[181] *Id*. at 24.

borrowers as to whether or not their employment will eventually qualify them for loan forgiveness."[182]

293.     Numerous lawsuits have been filed against Title IV servicers, alleging widespread misconduct.[183]

294.     Rather than addressing the servicer misconduct detailed in those lawsuits, the Department of Education has tried to prevent these suits from going forward by arguing— largely unsuccessfully[184]—that "State regulation of the servicing of the FFEL Program is preempted to the extent that it undermines uniform administration of the program," and that, "[t]o the extent that State servicing laws attempt to impose new prohibitions on misrepresentation or the omission of material information, those laws would also run afoul of the express preemption provision in 20 U.S.C. § 1098g."[185]

[182] *Id.*

[183] *See, e.g.*, *Hyland v. Navient Corporation*, No. 1:18-cv-09031 (S.D.N.Y.) (filed Oct. 3, 2018); *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 1:17-cv-00253, 2018 WL 5621872 (N.D. Fla. Sept. 20, 2018), *pending appeal*, No. 18-14490 (11th Cir.); *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, No. 3:17-cv-00183, 2017 WL 6501919 (S.D. Ill. Dec. 19, 2017), *vacated and remanded*, No. 18-01531, 2019 WL 2636822 (7th Cir. June 27, 2019); *Davis v. Navient Corp.*, No. 1:17-cv-00992 (W.D.N.Y.) (filed Oct.30, 2017); *Daniel v. Navient Solutions, LLC*, 8:17-cv-02503 (M.D. Fla.) (filed Oct. 25,2017); *Pennsylvania v. Navient Corp.*, No. 3:17-cv-01814 (M.D. Pa.) (filed Oct. 5, 2017); *Travis v. Navient Corp.*, No. 2:17-cv-04885 (E.D.N.Y.) (filed Aug. 18, 2017); *Demyanenko-Todd v. Navient Corp.*, No. 3:17-cv-00772 (M.D. Pa.) (filed May 1, 2017); *Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa.) (filed Jan. 18, 2017); *California v. Navient Corp.*, No. 18-567732 (Cal. Super. Ct.) (filed June 29, 2018); *Illinois ex rel. Madigan v. Navient Corp.*, No. 17 CH 00761 (Ill. Cir. Ct., Cook Cty.) (filed Jan. 18, 2017); *Massachusetts v. Pennsylvania Higher Educ. Assistance Agency*, No. 1784-cv-02682-BLS2 (Mass. Super. Ct.) (filed Aug. 23, 2017); *Mississippi v. Navient Corp.*, No. 1:18-cv-00982 (Miss. Chan. 1st Dist. Ct.) (filed July 17, 2018); *Washington v. Navient Corp.*, No. 17-2-01115-1 (Wa. Super. Ct.) (filed Jan. 18, 2017)

[184] *See, e.g.*, *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, __ F. 3rd__, 2019 WL 2636822 (7th Cir. June 27, 2019).

[185] Federal Preemption and State Regulation of the Dep't of Educ.'s Fed. Student Loan Programs and Fed. Student Loan Servicers, 83 Fed. Reg. 10,619-21 (Mar. 12, 2018).

295.     Moreover, the Department—at the direction of Secretary DeVos—has taken measures to prevent the CFPB—the agency responsible for protecting consumers of financial services—from obtaining information necessary to oversee and police the Title IV servicers.

296.     The CFPB has authority to examine Title IV servicers and ascertain their compliance with federal law.[186]

297.     In a letter to Senator Elizabeth Warren, the head of the CFPB revealed that "[s]ince December 2017, student loan servicers have declined to produce information requested by the Bureau for supervisory examinations related to Direct Loans and [FFEL] [L]oans held by the Department based on the Department's guidance."[187]

---

[186] The CFPB conducts reviews of student loan servicers pursuant to its statutory function to "collect[], research[], monitor[], and publish[] information relevant to the functioning of markets for consumer financial products and services to identify risks to consumers and the proper functioning of such markets." 12 U.S.C. § 5511(c)(3); *see also* CFPB, *Request for Information Regarding Student Loan Servicing*, 80 Fed. Reg. 29,302 (May 21, 2015) (relying on authority granted by 12 U.S.C. § 5511(c)). The CFPB is specifically empowered to appoint a student loan ombudsman who may "pre- pare an annual report" and "make appropriate recommendations" to the Secretary of Education regarding student loans. 12 U.S.C. § 5535. As relevant here, the CFPB "[d]etermine[s] whether the servicer has procedures, and whether the servicer follows its procedures, for circumstances where the borrower informs the servicer that a borrower is working in public service, including whether phone representatives assess the borrower's current circumstances and disclose the availability of any cancellation or loan forgiveness options reasonably believed to be the most appropriate to the borrower (e.g., PSLF, . . .)" and further "whether the servicer processes requests for borrower benefits, including benefits or protections . . . (e.g., PSLF . . .), in a timely and accurate manner." Consumer Fin. Prot. Bureau, *Education Loan Examination Procedures* 33 (June 2017), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/201706_cfpb_Education-Loan-Servicing-Exam-Manual.pdf. The CFPB has filed suit against one student loan servicer—Navient—pursuant to its statutory authority to enforce federal consumer financial laws. *See Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa.) (filed Jan. 18, 2017); *see also* 12 U.S.C.§§ 5564(a), (b); 15 U.S.C. §§ 1681s(b)(1)(H), 1692*l*(b)(6).
[187] Letter from Kathleen L. Kraninger to Elizabeth Warren at 2 (Apr. 23, 2019), https://www.warren.senate.gov/imo/media/doc/2019.04.23%20KK%20to%20Warren_student%20loan%20industry.pdf

298. As reported by National Public Radio, the CFPB asserts that it "is trying to do its job protecting student borrowers and supervising loan servicing companies, but [the Department of Education] is getting in the way."[188]

299. As a number of U.S. Senators recognized in letters sent to federal student loan servicers, this "disturbing news . . . reveals that the Department, under Secretary DeVos, has removed the most potent weapon"—the CFPB's supervisory examination authority—"from the CFPB's arsenal to fight illegal behavior and mistreatment of borrowers by student loan servicers, and that federal student loan servicers, who are paid by the federal government, are ignoring federal regulators' requests for information."[189]

300. In the face of these widespread errors, the Department of Education has refused to exercise its oversight responsibilities, has obstructed attempts by agencies like the CFPB to rein in servicer misconduct, has failed to institute a process that allows borrowers to raise servicer misconduct in their PSLF applications, and has refused to account for defendants Title IV servicers' misrepresentations in the PSLF review process. Plaintiffs originally planned to apply after ten years of payments, however, when her loans were transferred to the Title IV servicer, Nelnet, for servicing Nelnet confirmed with Plaintiff how to qualify for PSLF.

301. Nelnet informed Plaintiff Christensen that her loans would be forgiven under PSLF. They have never been forgiven.

302. Plaintiff Christensen asked Nelnet specifically about the Teacher Loan

---

[188] Chris Arnold, *CFPB Chief Says Education Department Is Blocking Student Loan Oversight*, National Public Radio (May 16, 2019), https://www.npr.org/2019/05/16/ 723568597/cfpb-chief-says-education-department-is-blocking-student-loan-oversight (last visited July 16, 2019).

[189] Letters from Senators Warren, Brown, Gillibrand, Durbin, and Whitehouse to Navient Solutions, LLC, Nelnet, Inc., and Pa. Higher Educ. Assistance Agency (May 14, 2019), https://www.npr.org/documents/2019/may/letters-to-servicers.pdf .

Forgiveness ("TLF") program, which forgives a portion of student loans for teachers working in eligible low-income schools for five years.

303.    Nelnet informed Mrs. Christensen that her school (Hunter High School) was considered a Title 1, low income school and that she was eligible for loan forgiveness after five years.  It has been over fourteen years and Mrs. Christensen is still repaying student loans that should have been forgiven through the TLF, PSLF or TEPSLF programs .

304.    TLF is available after five years of teaching in qualifying schools, regardless of whether a teacher remains at the same school.

305.    Due to the misrepresentations by Nelnet representatives, including failing to inform her that any qualifying payments toward TLF, Plaintiff Christensen continued to be misinformed and intentionally provided misrepresentations and steered away from loan forgiveness and had not received relief under the TLF, TEPSLF or PSLF programs.

306.    Marc Futterman has been in public service and after repeated misinformation, misconduct, and negligence by defendant servicers and the Department of Education, his student loan repayments, which he has on numerous months made 2-3 payments the same month, have not been accurately or correctly counted and his loans have not been forgiven.

307.    Plaintiff Wilson had the misfortune to have his loans serviced by one of the more notorious loan servicers, Navient.  He has made all monthly payments, yet the number of his loan payments determined "qualified" by Navient is substantially inaccurate, and points out, once again the incentive of Navient to keep borrowers under the lifelong bondage of student loans.

308.    The GAO estimated that a borrower owing $30,000 in federal loans who spent three years in Forbearance would pay $6,742 more than a borrower who was in enrolled in the

Standard Repayment Plan and was never in Forbearance.[190]

309.     The GAO also found that defendant servicers that encourage Forbearance over income-driven repayment plans place borrowers "at risk of incurring additional costs without any long-term benefits."[191]

310.     Borrowers already enrolled in an income-driven repayment plan must recertify their income and family size on a yearly basis.  However, Navient, for instance, prevents borrowers from recertifying their income or delays such certification such that borrowers incur additional payments or are put into a status that does not qualify for PSLF.

311.     According to the CFPB report, "[b]orrowers complain that when their recertification application [for an income-driven repayment plan] is not timely processed by their servicers, rather than extending their current income-driven payments, servicers require that borrowers make their full, standard monthly payment amount, or direct them to enter [F]orbearance.  Borrowers complain that when their standard monthly payment is unaffordable, [F]orbearance is their only realistic option. Borrowers further complain that their loans may spend months in [F]orbearance while their recertification application is under review, preventing them from progressing toward loan forgiveness available through [income-driven repayment] forgiveness options or PSLF."[192]

312.     According to a September 2015 report by the CFPB, out of a 2015 sample of Direct Loan borrowers, "57 percent of borrowers did not have a timely recertification of income processed. In addition, nearly one in three borrowers in the sample did not recertify within the

---

[190] U.S. GAO, Federal Student Loans, *supra* note 164
[191] *Id.* at 20.
[192] Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back*, *supra* note 14, at 13.

six months following their deadline."[193]

313. Furthermore, the CFPB found that borrowers who do not recertify receive billing statements based on the standard ten-year repayment schedule, with monthly payments that are often hundreds of dollars higher than the amount they paid under income-driven repayment.[194]

314. Borrowers whose recertification is not timely also have their unpaid interest capitalized, which can substantially increase the total cost of their loans.[195]

315. In a June 2017 report entitled "Staying on track while giving back," the CFPB provided an analysis of a sample of 8,494 federal student loan servicing complaints. Over 4,638, or 54%, of those complaints were against Navient, the highest of any of the Department of Education's servicers.[196]

316. The CFPB found that, of that sample, 13% of the student loan servicing complaints were related to income-driven repayment plan enrollment.[197]

317. The Department of Education has failed to institute any adequate process to consider applications for loan forgiveness that identifies and takes into account Nelnet's and other servicers blatant misleading misrepresentations about qualifying for PSLF.

---

[193] Consumer Fin. Prot. Bureau, Student Loan Servicing, *supra* note 73, at 32.

[194] *Id.* at 33.

[195] *Id.* at 34.

[196] Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back*, *supra* note 14, at 12.

[197] *The CFPB also issued a report in October 2017 that analyzed all complaints submitted to the agency by consumers between September 1, 2016 and August 31, 2017, including 12,900 federal student loan servicing complaints. 6,274 of the complaints, or 81%, were complaints about Navient. Of those complaints, 65% related to "dealing with your lender or servicer," 34% related to "struggling to repay your loan," and 1% related to "problem with credit report or credit score. Consumer Fin. Prot. Bureau,* Annual Report of the CFPB Student Loan Ombudsman: Strategies for Consumer *Driven Reform* 9 (Oct. 2017), https://files.consumerfinance.gov/f/documents/cfpb_annual_report_student-loan-ombudsman_2017.pdf .

318. The Department of Education's denial of Plaintiff's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicer's misrepresentations.

319. But for defendant servicer's misconduct, along with misrepresentations by The Department of Education, Plaintiffs and other Class Members payments of over 120 qualifying payments for PSLF should have been sufficient for loan forgiveness.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO ADMINISTRATIVE PROCESSING ERRORS PURSUANT TO 5 U.S.C. § 706(2)(A)

320. Plaintiff incorporates by reference all allegations contained in the preceding paragraphs (and all subparts thereto) as if set forth fully herein.

321. The Department of Education denied Plaintiffs' applications for relief under PSLF and TEPSLF programs.

322. The Department of Education's decisions with respect to the Administrative Error in denying Plaintiffs applications under PSLF and TEPSLF applications constituted final agency action.

323. No further exhaustion is necessary, and in any event, attempts at further exhaustion would be futile.

324. The Department of Education's decisions with respect to Administrative Error PSLF (including TEPSLF) applications were arbitrary and capricious, in that the Department of Education failed to consider an important aspects of the problem and made clear errors in

judgment.

325.    The Department of Education's denials of their administrative errors in evaluation

Plaintiffs' and other Class Members PSLF (including TEPSLF) applications were arbitrary and

capricious because those denials involved clear errors in judgment by the Defendants based on

arbitrary errors in the processing applications and rendering decision on Plaintiff and other Class

Members applications for PSLF (including TEPSLF) that was contrary to the evidence before it.

326.    The Department of Education's arbitrary and capricious PSLF and TEPSLF

determinations violated the APA and unlawfully deprived Plaintiffs, and Class Members of a

federal entitlement.

327.    Accordingly, Plaintiffs request an order vacating the PSLF denials and remanding

to the Department of Education with specific instructions to approve Plaintiffs and other Class

Members PSLF applications as required under 20 U.S.C. § 1087e(m) or in the alternative, an

order retaining jurisdiction and remanding to the Department of Education for further action with

respect to Plaintiffs and each Class Member, consistent with the APA.

## SECOND CAUSE OF ACTION
### INADEQUATE NOTICE OF DENIALS PURSUANT TO 5 U.S.C. § 555(e)

328.    Plaintiffs incorporate by reference all allegations contained in the foregoing

paragraphs (and all subparts thereto) as if set forth fully herein.

329.    The Department of Education's failure to provide adequate and timely notice of

any deficiencies and/or denial is a violation of the APA.

330.    The APA provides that "[p]rompt notice shall be given of the denial in whole or in

part of a written application, petition, or other request of an interested person made in connection

with any agency proceeding." 5 U.S.C. § 555(e). "Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial." *Id.*

331.     The Department of Education's denials with respect to administrative errors in processing Plaintiffs', and Class Members, PSLF (including TEPSLF) applications violated 5 U.S.C. § 555(e) of the APA, which requires, at a minimum, "a brief statement of the grounds for denial," because the Department of Education failed to explain why administrative error in processing Plaintiffs', and Class Members, 120 payments did not qualify for loan forgiveness.

332.     The Department of Education's PSLF and TEPSLF denials with respect to their administrative processing errors violated the APA by omitting any explanation as to why the Department of Education determined that the 120 payments made by Plaintiffs were not qualifying, thereby failing to provide a basis upon which to conclude the denials were the product of reasoned decision-making.

333.     Accordingly, Plaintiffs request an order vacating the PSLF and TEPSLF denials.

## THIRD CAUSE OF ACTION
## VIOLATION OF DUE PROCESS DUE TO ADMINISTRATIVE PROCESSING ERRORS PURSUANT TO THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

334.     Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

335.     The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law."

336.     Due process requires that, at a minimum, individuals receive notice and an

opportunity to be heard before they are deprived of property.

337. Plaintiffs and Class Members have constitutionally protected property interests in a government benefit to which they are legitimately entitled, namely their statutory interest in PSLF (including TEPSLF).

338. Plaintiffs contend that 20 U.S.C. § 1087e(m) contains mandatory language that the Department of Education "shall cancel the balance of interest and principal due" for borrowers who qualify for PSLF.

339. Thus, 20 U.S.C. § 1087e(m) creates a cognizable property interest for applicants in PSLF benefits.

340. By enacting TEPSLF, the Consolidated Appropriations Act of 2018 created an additional statutory pathway to reach the property interest of PSLF benefits.

341. Plaintiffs and Class Members, were each deprived of a property interest when the Department of Education denied their applications for PSLF (including TEPSLF) due to the Department of Education's own processing errors.

342. The Department of Education has denied these individuals their right to PSLF (including TEPSLF) without adequate process.

343. The Due Process Clause requires the Department of Education to implement a process that gives applicants for PSLF (including TEPSLF) adequate notice of the reasons for its denials of PSLF and TEPSLF applications and a meaningful process to identify and account for issues related to applicants' eligibility for this statutory entitlement to PSLF (including TEPSLF), including payment counting issues.

344. The Department of Education's current PSLF (including TEPSLF) application

processes does not provide applicants with adequate notice of the reasons for their denial, including the evidence upon which the Department of Education relied in reaching its decision. Nor does the Department of Education's current application processes provide applicants a meaningful process to contest the denial, present additional evidence of their eligibility for PSLF (including TEPSLF) and ensure that the Department of Education will take account of its errors.

345.     Due process requires the Department of Education to adopt PSLF (including TEPSLF) processes to allow applicants to raise issues and be heard as to their eligibility, including allowing them to identify the Department of Education's errors.  Such additional process is reasonable in light of the importance of the private interests affected—the PSLF benefit around which millions of borrowers have organized their lives.

346.     Borrowers are at risk of arbitrary and erroneous deprivation absent additional procedural safeguards.  Such process would place only limited additional burden on the Department of Education relative to the importance of providing borrowers with the statutory entitlement of PSLF.

347.     To remedy these Due Process violations, Plaintiffs and Class Members request:  (i) an order vacating the Department of Education's PSLF and TEPSLF denial action with respect to Plaintiffs and each Class Member; (ii) an order requiring the Department of Education to provide (a) PSLF and TEPSLF applicants with adequate notice of the grounds for their denial, including the specific reasons for the denial, including but not limited to, information concerning the months of alleged missed or disqualifying payments and the reason the Department of Education did not count those payments, as well as the evidence that the Department of Education relied upon in denying the application; (b) a meaningful decision-making process that minimizes the

risk of erroneous determinations, and includes a meaningful opportunity to identify and account

for errors made by the Department of Education and/or the Title IV servicers, through which

applicants may contest their denial and introduce evidence rebutting the Department of

Education's determination; and (c) a written and reasoned explanation for its determination within

a reasonable time period.

**FOURTH CLAIM FOR RELIEF**
**ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO SERVICER**
**MISCONDUCT PURSUANT TO 5 U.S.C. § 706(2)**

348.     Plaintiffs incorporate by reference all allegations contained in preceding

paragraphs (and all subparts thereto) as if set forth fully herein.

349.     The Department of Education's decisions with respect to the Defendant Servicer

Misconduct of Plaintiffs' PSLF (including TEPSLF) applications constituted final agency action.

350.     No further exhaustion is necessary and, in any event, attempts at further exhaustion

would be futile.

351.     As set forth above, the Department of Education knows about Defendant Title IV

servicers' widespread misrepresentations, which preclude borrowers from qualifying for loan

forgiveness, but disregards those misrepresentations in denying PSLF (including TEPSLF).

352.     With respect to the Defendant Servicer Misconduct, the Department of

Education's denial of PSLF (including TEPSLF) was arbitrary and capricious because the

Department of Education failed to consider that the Plaintiffs' Title IV servicers engaged in

misconduct resulting in Plaintiffs achieving PSLF (including TEPSLF) requirements.

353.     The Department of Education's arbitrary and capricious PSLF and TEPSLF

determinations violated the APA and unlawfully deprived these individuals of a federal

entitlement.  Accordingly, Plaintiffs request an order vacating the Plaintiffs' PSLF (including

TEPSLF) denials and remanding to the Department of Education with specific instructions to

discharge their student loan debt pursuant to the Department of Education's general discharge

authority under 20 U.S.C. § 1082(a)(4) and 20 U.S.C. § 1087a(b)(2) or in the alternative, an order

retaining jurisdiction and remanding to the Department of Education for further action with

respect to Plaintiff and Class Members, consistent with the APA.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF DUE PROCESS DUE TO SERVICER MISCONDUCT**
**PURSUANT TO THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION**

354.    Plaintiff incorporates by reference all allegations contained in the preceding

paragraphs (and all subparts thereto) as if set forth fully herein.

355.    The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty,

or property, without due process of law."

356.    Due process requires that, at a minimum, individuals receive notice and an

opportunity to be heard before they are deprived of property.

357.    Plaintiffs and Class Members, have constitutionally protected property interests in

a government benefit to which they are legitimately entitled, namely their statutory interest in

PSLF (including TEPSLF).

358.    20 U.S.C. § 1087e(m) contains mandatory language requiring the Department of

Education to cancel the balance of interest and principal due from borrowers who qualify for

PSLF. Thus, 20 U.S.C. § 1087e(m) creates a cognizable property interest for applicants in PSLF

benefits.  By enacting TEPSLF, the Consolidated Appropriations Act of 2018 created an

additional statutory pathway to reach the property interest of PSLF benefits.

359.     Plaintiffs were deprived of a property interest in PSLF when the Department of Education denied their applications for PSLF (including through TEPSLF), even though their alleged ineligibility was due to misrepresentations made by Defendant Title IV servicers.  The Department of Education denied Plaintiffs, and Class Members, their right to PSLF (including TEPSLF) without adequate process.

360.     The Due Process Clause requires the Department of Education to implement a process that gives PSLF (including TEPSLF) applicants adequate notice of the reasons for their denial and a meaningful process to identify and account for issues related to applicants' eligibility for this statutory entitlement to PSLF, including misinformation provided by Defendant loan servicers.

361.     The Department of Education's current PSLF (including TEPSLF) application processes do not provide applicants with adequate notice of the reasons for their denial, including the evidence upon which the Department of Education relied in reaching its decision.  Nor do the Department of Education's current application processes provide applicants a meaningful opportunity to contest the denial, to present additional evidence of their eligibility for PSLF (including TEPSLF), and to ensure that the Department of Education will take account of Title IV servicers' misconduct.

362.     Due process requires the Department of Education to adopt PSLF (including TEPSLF) processes that allow applicants to raise issues and be heard as to their eligibility, including allowing them to identify the Title IV servicers' misconduct. Such additional process is reasonable in light of the importance of the private interests affected—the PSLF (including TEPSLF) benefit around which millions of borrowers have organized their lives.

363. Borrowers are at risk of erroneous and arbitrary deprivation absent additional procedural safeguards. Such process would place only limited additional burden on the Department of Education relative to the importance of providing borrowers with the statutory entitlement of PSLF (including TEPSLF).

364. To remedy these Due Process violations, Plaintiff and Class Members, request: (i) an order vacating the Department of Education's PSLF and TEPSLF denial actions with respect to Plaintiff and each Class Member; (ii) an order requiring the Department of Education to provide (a) PSLF and TEPSLF applicants with adequate notice of the grounds for their denial, including the specific reasons for the denial, and including but not limited to, the evidence the Department of Education relied upon in denying the application; (b) a meaningful decision-making process to account for misrepresentations made by the Department of Education and/or Title IV servicers, through which applicants may contest their denial and introduce evidence rebutting the Department of Education's determination and/or demonstrate that the Department of Education should exercise its general discharge authority to issue forgiveness; and (c) a written and reasoned determination within a reasonable time period.

## SIXTH CLAIM FOR RELIEF
### ASSERTED ON BEHALF OF PLAINTIFFS AND THE CLASS – UNJUST ENRICHMENT

365. Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs (and all subparts thereto) as if set forth fully herein.

366. As a result of Defendants' deceptive, misleading actions, as described above, Defendants were enriched at the expense of Plaintiffs and the Class through having Plaintiffs and Class Members continue to pay on loans that should have been forgiven.

367.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiffs and the Class.  Thus it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiffs and Class Members for monies paid to Defendants as a result of the unfair, deceptive practices engaged in by the Department of Education and the Title IV servicing companies.

## SEVENTH CLAIM FOR RELIEF
### DECLATORY JUDGMENT

368.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if full restated here.

369.     The Declaratory Judgment Act ("DJA") states:

"In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."
  28 U.S.C. § 2201(a).

370.     In the case at hand, there is an actual controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, due to the imminence of harm facing Plaintiffs and Class Members.  As set forth above, Class Members have already suffered denial of PSLF and TEPSLF benefits and have been required to continue making payments on loans that should have lawfully been forgiven, and instead the Department of Education has required Plaintiffs and Class Members to continue making payments on loans which the Department of Education denied a discharge/forgiveness.

371.     Plaintiffs seek a declaration that the Department of Education has breached a

contract between itself and Plaintiffs and Class Members by failing to follow Congressional

mandates to forgive qualifying loans for public servants.

<h2 style="text-align:center"><u>EIGHTH CLAIM FOR RELIEF</u><br>CONVERSION</h2>

372.     Plaintiffs incorporate by reference each and every prior and subsequent allegation

of this Complaint as if full restated here.

373.     Plaintiffs allege that by failing to forgive Plaintiff and Class Members loans, and

thereafter continuing to demand, and receive loan payments that should have been forgiven and

discharged, constituted a conversion of Plaintiffs and Class Members funds.

374.     Plaintiffs assert that the money Plaintiffs and Class Members deposited to the

Department of Education, and Defendant Loan Servicers, and which the Defendants possessed

and maintained control over, were funds that the Defendants were not entitled to and that the

possession thereof constituted a conversion of Plaintiffs and Class Members money.

375.     Plaintiffs contend that in addition to the funds improperly received by the

Department of Education, the Department of Education additionally continues to charge interest,

fees, and other charges against loans that by law, should have been forgiven, and that as a result

thereof Plaintiffs and Class Members have suffered damages, including, but limited to, a loss of

money, credit reporting damage, increased borrowing costs and other damages to be proven at

trial.

376.     Plaintiffs allege that as a direct and proximate conversion of their funds, and

requirement that they continue to incur interest and make payments on a loan that should have

been forgiven, Plaintiffs have been deprived of the possession and use of their money and have

suffered anxiety, stress and other damages.

## NINTH CLAIM FOR RELIEF
### Breach of Contract For Violations of The Servicing Contracts

377. Plaintiffs repeat and re-allege each and every allegation set forth above, as if fully set forth herein.

378. Plaintiffs allege the Servicing Contracts, in addition to statements by the Department of Education and Defendant Loan Servicers, as outlined above, make clear that Plaintiffs and those similarly situated were intended to be third-party beneficiaries of the Servicing Contracts and all subsequent modifications and change orders.

379. As detailed above the Servicing Contracts entered into between The Department of Education and Defendant Loan Servicers obligate Defendant Loan Servicers to comply with all federal and state laws and regulations, including those requiring that borrowers have access to PSLF and income-driven repayment.

380. The Servicing Contracts contain the following additional terms specifically obligating Defendant Loan Servicers to provide truthful information to borrowers about PSLF:

• "In some cases Direct Loans will need to be serviced differently than FFEL loans, a few examples of these differences are listed below (not an all inclusive list): … Public service loan forgiveness is only offered in the [Direct Loans]…."

• "The servicer shall support servicing of all Direct Loans, including Direct Consolidation Loans," which servicing includes offering PSLF to interested borrowers.

The full text of the Servicing Contracts is not available without discovery, but the above-referenced portions of the Contracts, together with the Department of Education's statements,

indicate that there may be further provisions in the Contracts requiring Defendant Loan Servicers to provide truthful information to borrowers about PSLF.

381.    Defendant Loan Servicers materially breached the above-referenced obligations of the Servicing Contracts by giving borrowers incorrect and misleading information about PSLF and income-driven repayment plans, including, but not limited to: (i) falsely informing borrowers that Defendant Loan Servicers "doesn't do" PSLF; (ii) advising borrowers to delay filing their PSLF applications and Employment Certification Forms so that they were making additional payments that may not have qualified for PSLF; (iii) steering borrowers into the Graduated Repayment Plan, the Extended Repayment Plan, Deferment, or Forbearance (which do not count as qualifying repayment plans under PSLF) instead of income-driven repayment plans that qualify for PSLF; and (iv) telling borrowers who had non-qualifying student loans or who were enrolled in non-qualifying repayment plans that they would qualify for PSLF.

382.    As a result of Defendant Loan Servicer's breach of the terms of the Servicing Contracts, Plaintiffs and members of the Nationwide Class have suffered substantial damages including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Defendant Loan Servicer's misconduct.

383.    As a result of Defendant Loan Servicer's breaches of the terms of the Servicing Contracts, Plaintiffs and members of the Nationwide Injunctive Class have suffered, and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Defendant Loan Servicer's about their eligibility for PSLF.

384.     In the alternative, even if not a breach of the express terms of the Servicing Contracts, Defendant Loan Servicer's conduct breached the covenant of good faith and fair dealing implied in the Servicing Contracts.

## TENTH CLAIM FOR RELIEF
### Breach of Implied Warranty of Authority

385.     Plaintiffs repeat and re-allege each and every allegation set forth above in paragraphs 1 to 384 as if fully set forth herein.

386.     Plaintiffs bring this Claim against Defendant Loan Servicer's on behalf of members of the Nationwide Class and Nationwide Injunctive Class.

387.     This claim is pleaded in the alternative to the Ninth Claim for relief in the event that Defendant Loan Servicer's establish they did not owe Plaintiffs and others similarly situated duties under the Servicing Contracts as third-party beneficiaries.

388.     Federal law, including the College Cost of Reduction and Access Act, confers certain benefits on borrowers including, but not limited to, access to income driven repayment plans and PSLF.

389.     As detailed more fully above Defendant Loan Servicers repeatedly represented to borrowers that they should be consulted for their advice and guidance, holding themselves out as an advisor that borrowers could trust when evaluating their options for income-driven repayment plans and eligibility for the PSLF.  For example, Defendant Navient in on record as having indicated that its goal is to "[l]everag[e] four decades of expertise" to "help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals" by offering clients "financial literacy tools and in-depth customer service," "[e]xpert guidance while in

school and beyond," and "[h]elp [that] is a phone call away." Navient's CEO has stated that the company's "name—Navient—symbolizes the expertise, experience, and dedication we consistently deliver for our client and customers."

390. Plaintiffs allege that all Loan Servicer Defendants purported to act as an advisors and agents on behalf of the Department of Education, repeatedly giving borrowers who were relying on Defendant Loan Servicer's inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

391. Given these representations, and as detailed more fully above, Plaintiffs and others similarly situated justifiably acted upon Defendant Loan Servicer's inaccurate and misleading statements by not consolidating FFEL Loans into Direct Loans, remaining in non-qualifying repayment plans, and failing to submit Employment Certification Forms.

392. Plaintiffs assert that as a result of Defendant's conduct, Plaintiffs and members of the Nationwide Class have suffered substantial damages including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Defendant Loan Servicer's misconduct.

393. Plaintiffs contend that as a result of Defendant Loan Servicer's conduct, Plaintiffs and members of the Class have suffered and are at imminent risk of suffering irreparable harm including, but not limited to, being misled by Defendant Loan Servicer's about their eligibility for PSLF.

394. Plaintiffs allege they had no reason to believe that Defendant Loan Servicer's were acting outside the scope of its actual authority when they gave Plaintiffs inaccurate and

misleading information about their options for income-driven repayment plans and their

eligibility for the PSLF program, and at no time did any of the Defendant Loan Servicer's inform

Plaintiffs that they were so doing.

## ELEVENTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACT

395.    Plaintiffs repeat and reassert each and every allegation as set forth above as if

described in full particularity herein, and incorporate the same by reference.

396.    Plaintiffs and members of the Nationwide Class have each entered into a valid

contract, namely an MPN Contract with a lender (FFEL Loans), FFELP, or the Department of

Education (Direct Loans).

397.    As detailed above the FFEL and FEELP Loan MPN Contract and Direct Loan

MPN Contract mandate that the lender or the Department of Education comply with both the

Higher Education Act and the Department of Education's regulations.

398.    Under the Higher Education Act and the Department of Education's regulations

applicable to FFEL Loans, borrowers are entitled to access to income sensitive repayment terms,

income-based repayment plans, and an opportunity to consolidate their FFEL Loans into Direct

Loans to pursue PSLF.

399.    Under the Higher Education Act and the Department of Education's regulations

applicable to Direct Loans, borrowers are entitled to access to income driven repayment plans

and PSLF.

400.    Defendant Loan Servicer's had knowledge of the aforementioned MPN Contracts

and their rights, duties and obligations thereunder.

401.    Plaintiffs contend that Defendant Loan Servicer's conduct induces the

Department of Education and others to breach the FFEL Loan MPN Contract and/or Direct Loan MPN Contract. The breach of these contracts would not have occurred but for the Defendant Loan Servicer's conduct.

402. Plaintiffs allege that Defendant Loan Servicer's acts and conduct, intentionally when it induces the Department of Education and others to breach the FFEL and FFELP Loan MPN Contracts and/or Direct Loan MPN Contract.

403. Plaintiffs assert that specifically Defendant Loan Servicer's gave borrowers incorrect and misleading information, including: (i) informing borrowers who had non-qualifying student loans or who were enrolled in non-qualifying repayment plans that they would qualify for PSLF; (ii) preventing borrowers from consolidating their FFEL Loans into Direct Loans for the purpose of qualifying for PSLF; (iii) falsely informing borrowers that Defendant Loan Servicer's do not do PSLF; (iv) advising borrowers to delay filing their PSLF applications and Employment Certification Forms so that borrowers were making additional payments that may not have qualified for PSLF; and (v) steering borrowers into the Graduated Repayment Plan, the Extended Repayment Plan, Deferment, or Forbearance (which do not count as qualifying repayment plans under PSLF) instead of income-driven repayment plans that qualify for PSLF.

404. Plaintiffs contend that Defendant Loan Servicer's conduct raises to the level or tortious interference with the ability of Plaintiffs and others similarly situated to enjoy the benefits of the FFEL Loan MPN Contract and/or Direct Loan MPN Contract, specifically, to have access to and qualify for PSLF.

405. Plaintiffs allege that since several of the Defendant Loan Servicers, as well as the

United States Department of Education, have admitted that Defendant Loan Servicers are agents of the Department of Education for the purposes of the MPN Contracts, Defendant Loan Servicers are, *ergo,* liable under this Eleventh Claim for acting outside the scope of their agency by failing to comply with its obligations under the Higher Education Act and the Department of Education regulations, acting in bad faith, and committing independent torts and predatory acts as listed in this Amended Class Action Complaint for personal pecuniary gain.

**TWELVTH CLAIM FOR RELIEF**
**TORTIOUS INTERFERENCE WITH CONTRACT EXPECTANCY**

406.    Plaintiffs repeat and reassert each and every allegation as set forth above as if described in full particularity herein, and incorporate the same by reference.

407.    The College Cost Reduction and Access Act[198] creates a statutory entitlement to PSLF for qualifying borrowers, guaranteeing that the balance of interest and principal due on a loan borrower's eligible Direct Loan not in default "shall" be "cancel[led]" when such borrower has made 120 monthly payments on such loan and is employed in a public service job at the time of such forgiveness and was similarly employed during the period the borrower made each of the required payments

408.    Plaintiffs and others similarly situated have Direct Loans, FFELP or FFEL Loans that they are willing to consolidate into Direct Loans, and have been employed full-time by a qualifying public service employer and, as such, have a statutorily created expectancy that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF-qualifying payments.

409.    Plaintiff assert that Defendant Loan Servicer's knew of the statutorily created

---

[198] Pub. L. No. 110-84, § 401, 121 Stat. 784, 800 (2007) (codified at 20 U.S.C. § 1087e(m)).

expectancy of Plaintiffs and others similarly situated that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF-qualifying payments.

410.    Plaintiff allege that Defendant Loan Servicer's intentionally interfered with that statutorily created expectancy by, as detailed above, making misrepresentations to Plaintiffs and others similarly situated concerning their options for income-driven repayment plans and their eligibility for PSLF.

411.    As detailed above, Defendant Loan Servicer's knew, or should have known, that the misrepresentations they made to Plaintiffs and others similarly situated were false and misleading.

412.    Plaintiffs and others similarly situated are reasonably certain that, absent Defendant Loan Servicer's independently tortious interference with their statutorily created expectancy, the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF-qualifying payments.

413.    Plaintiffs allege that Defendant Loan Server's tortious conduct interferes with the statutorily created expectancy of Plaintiffs and others similarly situated that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF qualifying payments.

414.    As a result of Defendant Loan Servicer's tortious interference with the statutorily created expectancy of Plaintiffs and others similarly situated that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF qualifying payments, Plaintiffs and members of the Nationwide Class have suffered substantial damages including, but not limited to: (i) excess payments under repayment plans or for loans that did not

qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Defendant Loan Servicer's misconduct.

415.    As a result of Defendant Loan Servicer's tortious interference with the statutorily created expectancy of Plaintiffs and others similarly situated that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF qualifying payments, Plaintiffs and members of the Nationwide Injunctive Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Defendant Loan Servicer's about their eligibility for PSLF.

**THIRTEENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

416.    Plaintiffs repeat and reassert each and every allegation as set forth above as if described in full particularity herein, and incorporate the same by reference.

417.    Plaintiffs allege, in event that Plaintiffs and others similarly situated are not determined to constitute third-party beneficiaries of the Servicing Contracts, that Plaintiffs and Class Member have conferred a benefit on Defendant Loan Servicers.

418.    Plaintiffs assert that their continues payments, not having their loans forgiven, and loan servicing fees received by Defendant Loan Servicers constituted an unjust enrichment by: (i) making excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) accruing unpaid interest added to the principal balance; and (iii) losing the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Defendant Loan Servicer's misconduct

419.    Plaintiffs contend that studies by GAO and others knowledge the aforementioned

benefits were voluntarily accepted, and Defendant Loan Servicer's retained the benefit.

420. Such benefit was conferred upon Defendant Loan Servicer's without sufficient justification at the expense of Plaintiffs and the members of the Nationwide Class.

421. Under the circumstances set forth above, it would be unequitable for Defendant Loan Servicer's to retain the benefit of the loan servicing fees that borrowers would otherwise not have paid to Defendant Loan Servicers, had Defendant Loan Servicer's provided truthful and accurate information to borrowers regarding their student loans.

## FOURTEENTH CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY

422. Plaintiffs repeat and re-allege each and every allegation set forth above as if set forth with fully particularity herein, and incorporate by reference the above.

423. Plaintiffs and Class Members bring this Claim against all Defendants, jointly and severally, alleging that all Defendants had and have a continuing fiduciary duty to borrowers to provide accurate information regarding their options for loan repayment, including income-driven repayment plans and the PSLF program.

424. Plaintiffs assert that Defendants hold themselves out as an authority on student loan repayment options and encourages borrowers to contact them if they have any questions about their student loans.

425. Defendant Loan Servicer's websites are and were filled with assurances that borrowers can trust the individual Defendant Loan Servicer's expertise in student loans, such as: "Student borrowers who reach out to their servicer when they have questions tend to be more successful in repayment. Navient is here to help," and "We help students navigate the lifecycle of their loan with expert guidance while in school and beyond."

426.     Plaintiff alleges that Defendant Loan Servicer's assure borrowers they are there to answer borrowers questions, provide borrowers with solutions, and process borrowers payments. Navient, for example, urged borrowers to "Contact us to discuss your student loan obligations. We can answer any questions you have about paying back your loans and the types of repayment plans available to you."

427.     Defendant Loan Servicer's have made it clear to borrowers that they can trust their representatives to guide them through the PSLF and income-driven repayment application processes, stating: Some third-party companies may claim they can reduce or eliminate your student loan debt, but they charge fees for services that, and other federal loan servicers offer that same information for free.

428.     Plaintiffs contend that Defendant Loan Servicer's undertook the role of advising and counseling Plaintiffs about their student loan repayment options, including PSLF.

429.     Plaintiffs allege that Defendant Loan Servicers induced Plaintiffs to depend on them and encouraged the borrowers to place special trust and confidence in the Defendant Student Loan Servicers based on the representations made by the Defendant Loan Servicers along with statement made by the Department of Education about Defendant Loan Servicer's expertise regarding student loan repayment and PSLF.

430.     Plaintiffs allege that Defendant Loan Servicer's knew or should have known that Plaintiffs and others similarly situated placed their trust and confidence in Defendant Loan Servicer's and depended on Defendant Loan Servicer's to counsel and inform them about their student loan repayment options, including PSLF.

431.     Plaintiffs assert that Defendant Loan Servicer's breached their fiduciary duty by

repeatedly giving borrowers inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for the PSLF Program.

432.    Plaintiffs allege that the Defendant Loan Servicer's breach has led to damages to Plaintiffs and members of the Nationwide Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Defendant Loan Servicer's misconduct.

433.    Plaintiff's assert that as a result of Defendant Loan Servicer's breaches of their fiduciary duty, Plaintiffs and members of the Nationwide Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Defendant Loan Servicer's about their eligibility for PSLF.

### FIFTEENTH CLAIM FOR RELIEF
### NEGLIGENCE

434.    Plaintiffs repeat and re-allege, and incorporate by reference, each and every allegation set forth above as if fully set forth herein.

435.    Plaintiffs allege that Defendant Loan Servicer's, by virtue of being a loan servicer on behalf of the federal government and Plaintiffs, have a duty of care due to their special position of confidence and trust with borrowers, who are told by Defendant Loan Servicer's and by the Department of Education, as outlined above, that they should reach out to the Defendant Loan Servicer's if they require information about their eligibility for PSLF.

436.    Plaintiffs contend that Defendant Loan Servicer's have breached that duty by compensating their employees for minimizing the amount of time they spend discussing borrowers' repayment options and incentivizing them to steer borrowers into the Extended

Repayment Plan, the Graduated Repayment Plan, Deferment, or Forbearance, rather than income-driven repayment plans that qualify under PSLF.

437. That breach has actually and proximately caused damages to Plaintiffs and members of the Nationwide Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Defendant Loan Servicert's misconduct.

438. As a result of Defendant Loan Servicer's negligence, Plaintiffs and members of the Nationwide Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Defendant Loan Servicer's about their eligibility for PSLF.

**SIXTEENTH CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION**

439. Plaintiffs repeat and re-allege each and every allegation set forth above in as if fully set forth herein.

440. Plaintiffs assert that Defendant Loan Servicers, as a federal student loan servcers, have a duty of care due to their special position of confidence and trust with borrowers, who are told by Defendant Loan Servicer's and by the Department of Education, as outlined above, that they should reach out to the Defendant Loan Servicer's if they require information about their student loan repayment options.

441. Plaintiffs allege that Defendant Loan Servicer's, knowing and intending that Plaintiffs would act upon their advice, repeatedly gave Plaintiffs inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

442.    Plaintiffs contend, as detailed above, Defendant Loan Servicer's knew or should have known that this information was inaccurate and misleading.

443.    Plaintiffs assert, as described above, Plaintiffs and others similarly situated individuals justifiably acted in reliance upon Defendant Loan Servicer's inaccurate and misleading statements by not consolidating FFEL Loans into Direct Loans, remaining in non-qualifying repayment plans, and failing to submit Employment Certification Forms.

444.    Plaintiffs allege that Defendant Loan Servicer's conduct has led to damages to Plaintiffs and Class Members including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Defendant Loan Servicer's misconduct.

## SEVENTEENTH CLAIM FOR RELIEF
## VIOLATIONS OF CONSUMPER PROTECTION ACTS

445.    Plaintiffs repeat and re-allege each and every allegation set forth above as if set forth in full particularity herein.

446.    Plaintiffs bring this Count against all Defendants for violations of the Utah Consumer Protection Act, UCA 13-11-1 *et seq*.; (a) Section (2) to protect consumers from suppliers who commit deceptive and unconscionable sales practices; (b) Section 13-11-5 (c) (3) In determining whether an act or practice is unconscionable, the court shall consider circumstances which the supplier knew or had reason to know6.

447.    The Texas Deceptive Trade Practices-Consumer Protection Act makes it unconscionable to take advantage of a consumers lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with any false, misleading or deceptive acts.

448.     Washington D.C's Consumer Protection Procedures Act DC Official Code

Section 28-3901 et seq.  28-3904 "It shall be a violation of this chapter for any person to engage

in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived,

or damaged thereby, including to: (e) misrepresent as to a material fact which has a tendency to

mislead."

449.     The Federal Trade Commission Act (FTC Act) (15 USC45) prohibits "unfair or

deceptive acts or practices in or affecting commerce" and many statutes give citizens private

rights to bring certain actions.

450.     As detailed above, Defendant Loan Servicers have engaged in a pattern of "unfair

or deceptive trade practice" in Utah, Washington, D.C., Texas, and elsewhere by repeatedly

giving Plaintiff borrowers inaccurate and misleading information about their options for income-

driven repayment plans and their eligibility for PSLF.

451.     Defendants have engaged in a pattern of misconduct, and unfair deceptive trade

practices, as defined in the above statutes, and has provided Plaintiffs' and Class members

inaccurate and misleading information about their options for income-driven repayment plans

and their eligibility for PSLF.

452.     Defendant Loan Servicer's conduct has led to damages to Plaintiffs and Class

members, including, but not limited to: (i) excess payments under repayment plans or for loans

that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss

of the benefit of PSLF by individuals who would have otherwise qualified for PSLF, but for

Defendant Loan Servicer's misconduct.

453.     Defendant Loan Servicer's, as a federal student loan servicer, had a duty of care

due to its special position of confidence and trust with borrowers, who are told by Defendant Loan Servicer's and by the Department of Education, as outlined above, that they should reach out to the individual Defendant Loan Servicer's if they required information about their student loan repayment options.

454.    As detailed above, Defendant Loan Service providers made misrepresentations of material fact that were false, namely repeatedly giving Plaintiffs inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

455.    Plaintiffs allege that Defendant Loan Service providers knew and intended that Plaintiffs would rely upon their advice with respect to options for income-driven repayment plans and eligibility for PSLF.

456.    As detailed above, Defendant Loan Servicer's were negligent because they knew or should have known that the advice they were giving with respect to options for income-driven repayment plans and eligibility for PSLF was inaccurate or misleading.

457.    As detailed above, Plaintiffs and others similarly situated justifiably acted in reliance upon Defendant Loan Servicer's inaccurate and misleading statement by not consolidating FFEL Loans into Direct Loans, remaining in non-qualifying repayment plans, and failing to submit Employment Certification Forms.

458.    Defendant Loan Servicer's misrepresentations have led to damages to Plaintiffs and members of the Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Defendant Loan Servicer's misconduct.

459.     As detailed above, Defendant Loan Servicer's engaged in "unfair or deceptive trade practices" in the states of Utah, Texas, Washington, D.C. and elsewhere by repeatedly giving Plaintiffs and other borrowers inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

460.     Defendant Loan Servicer's unfair and deceptive practices occurred in the conduct of "trade or commerce" far beyond simply collecting payments.  Defendant Loan Servicer's Contracts and their own statements indicate that Defendant Loan Servicers were responsible for providing "services" for the benefit of borrowers and managing "all types of" student loan obligations.

461.     More specifically, Defendant Loan Servicer's were responsible for providing borrowers accurate information about the repayment and forgiveness options available under federal law, advising and communicating the best options given each borrower's specific financial circumstances, helping borrowers stay up-to-date on payments, and providing the highest quality support to borrowers.

462.     These services, often involving frequent communication between Defendant Loan Servicer's and each borrower to assist and advise each borrower, extended far beyond mere collection of loans.  Instead of properly providing these services, Defendant Loan Servicer's engaged in "unfair or deceptive acts or practices" by repeatedly misrepresenting information to borrowers.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

*First*, certifying this action as a class action pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

*Second*, declaring, adjudging, and decreeing the conduct alleged herein as unlawful including, but not limited to, Defendant Loan Servicer's improper incentivizing of their employees to steer Plaintiffs and members of the Classes into Extended Repayment Plans, Graduated Repayment Plans, Deferments, or Forbearances, rather than income-driven repayment plans that qualify under PSLF;

*Third*, enjoining Defendant Loan Servicer's from continuing improperly to incentivize their employees to steer Plaintiffs and members of the Classes into the Extended Repayment Plans, Graduated Repayment Plans, Deferments, or Forbearances, rather than income-driven repayment plans that qualify under PSLF;

*Fourth*, declaring, adjudging, and decreeing the conduct alleged herein as unlawful including, but not limited to, Defendant Loan Servicer's misrepresentation to Plaintiffs and members of the Classes that they are not eligible for PSLF, providing incorrect information to Plaintiffs and members of the Classes regarding PSLF, and affirmatively restricting Plaintiffs and members of the Classes ability to enroll in PSLF;

*Fifth*, enjoining Defendant Loan Servicer's from continuing to misrepresent to Plaintiffs and members of the Classes that they are not eligible for PSLF, providing incorrect information to

Plaintiffs and members of the Classes regarding PSLF, and affirmatively restricting Plaintiffs and members of the Classes' ability to enroll in PSLF; and to require Defendant Loan Servicer's to change their incentive compensation programs so that their employees are not paid based on how quickly they can end a conversation with a borrower;

*Sixth*, awarding compensatory and punitive damages along with pre- and post-judgment interest;

*Seventh*, granting Plaintiffs the costs of suit, including reasonable attorneys' fees and expenses;

Eighth, providing treble damages and punitive damages against Defendants Loan Service providers for false, deceptive, misleading representations which mislead consumers;

*Eighth*, a declaration that the Department of Education's denials of the Plaintiffs' PSLF (including TEPSLF) applications violate the Administrative Procedure Act and violate the Fifth Amendment's Due Process Clause.

*Ninth*, a declaration that the Department of Education's PSLF (including TEPSLF) application processes deprive Plaintiffs and Class Members of their constitutional right to due process by depriving them of a protected property right in PSLF.

*Tenth*, with respect to the First, Second, and Fourth Claims for Relief, an order vacating the Department of Education's PSLF (including TEPSLF) denial actions with respect to Plaintiffs and Class Members.

*Eleventh*, with respect to the First and Fourth Claims for Relief, an order remanding to the Department of Education with direction for the Department of Education to approve Plaintiffs and each Class Members' requests for forgiveness, whether under 20 U.S.C. 1087e(m) or the Department of Education's general discharge authority, or in the alternative, an order retaining jurisdiction and remanding to the Department of Education for further action with respect to Plaintiffs and each Class Member herein, consistent with the APA.

*Twelfth*, with respect to the Third and Fifth Causes of Action, an order vacating the Department of Education's PSLF (including TEPSLF) denial actions with respect to Plaintiffs and each Class Member.

*Thirteenth*, an order requiring the Department of Education to provide the Court with a status report detailing steps taken to comply with this Court's order, including copies of all instructions, guidelines, or other information sent to Title IV servicers.

*Fourteenth,* an order certifying the Class and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and appointing Plaintiffs as representatives of the Class and appointing the lawyers and law firm representing Plaintiffs as counsel for the Class.

*Fifteenth,* for all recoverable compensatory, statutory and other damages sustained by Plaintiffs and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law.

*Sixteenth*, granting Plaintiffs and the Class awards of restitution and/or disgorgement of profits and ordering the Department of Education to immediately cease and desist from collection from Plaintiffs and Class Member on loans that should have received a discharge/forgiveness.

*Seventeenth,* an order granting a declaratory judgment against the Department of Education, and its servicing partners enjoining the Department of Education from denying PSLF and TEPSLF applications, cease collection activities, adjudicate Plaintiffs and Class Member student loans paid.

*Eighteenth*, such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED October 15, 2019.

Christensen Young & Associates, PLLC
___/s/ Steven A. Christensen___.
Steven A. Christensen
Cameron S. Christensen
Christensen Young & Associates, PLLC
9980 So. 300 West, #200
Sandy, Utah, 84070
(801) 676-6447
steven@christensenyounglaw.com
cameron@christensenyounglaw.com